# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Securities and Exchange Commission, | Civil No. 10-3995 (DWF/JJK) |
| Plaintiff, | |
| v. | **MEMORANDUM**<br>**OPINION AND ORDER** |
| True North Finance Corporation,<br>formerly known as CS Financing Corporation;<br>Capital Solutions Monthly Income Fund, LP,<br>formerly known as Hennessey Financial<br>Monthly Income Fund, LP; Capital<br>Solutions Distributors, LLC; Capital<br>Solutions Management, LP; Transactional<br>Finance Fund Management, LLC;<br>Todd A. Duckson; Michael W. Bozora;<br>Timothy R. Redpath; and Owen Mark Williams, | |
| Defendants. | |

_____

Eric M. Phillips, Esq., Marlene B. Key, Esq., and Daniel J. Hayes, Esq., US Securities and Exchange Commission, counsel for Plaintiff.

Philip T. Colton, Esq., and William A. McNab, Esq., Winthrop & Weinstine, PA, counsel for Defendant True North Finance Corporation, formerly known as CS Financing Corporation.

Scott R. Carlson, Esq., DC Law Chartered, counsel for Defendants Capital Solutions Monthly Income Fund, LP, formerly known as Hennessey Financial Monthly Income Fund, LP, and Transactional Finance Fund Management, LLC.

Andrea D. Kiehl, Esq., and Cynthia A. Bremer, Esq., Ogletree, Deakins, Nash, Smoak & Stewart, P.C.; Michael Z. Gurland, Esq., Michael Moshe Zmora, Esq., and Phillip L. Stern, Esq., Neal, Gerber & Eisenberg LLP, counsel for Defendants Capital Solutions Distributors, LLC, Capital Solutions Management, LP, Michael W. Bozora, and Timothy R. Redpath.

Lawrence J. Field, Esq., and Bryant D. Tchida, Esq., Leonard Street and Deinard, PA, counsel for Defendant Todd A. Duckson.

Andrew M. Luger, Esq., and Jenny Gassman-Pines, Esq., Greene Espel PLLP; and Brent R. Baker, Esq., Parsons Behle & Latimer, counsel for Defendant Owen Mark Williams.

_____

## INTRODUCTION

This matter is before the Court on a Joint Motion for Summary Judgment brought by Defendants Capital Solutions Monthly Income Fund, LP and Transactional Finance Fund Management, LLC ("TFFM") (Doc. No. 113) and a Motion for Summary Judgment brought by Defendant Todd A. Duckson ("Duckson") (Doc. No. 117).  For the reasons set forth below, Defendants' motions are granted in part and denied in part.

## BACKGROUND

This matter involves the Securities and Exchange Commission's ("SEC") allegations of fraud in the offer and sale of interests in the Capital Solutions Monthly Income Fund, LP, f/k/a Hennessey Financial Monthly Income Fund, LP (the "Fund"), an unregistered investment pool.  (Doc. No. 97 (First Am. Compl. ("FAC")) ¶¶ 1–3, 26.) The SEC alleges that Defendants engaged in written and oral misrepresentations to investors and brokers from March 2008 to December 2009.  (FAC ¶¶ 2–19.)  In the First Amended Complaint, the SEC asserts three counts of securities fraud against the Fund, TFFM, and Duckson:  primary violations of Section 10(b) of the Exchange Act 15 U.S.C. § 78j(b) and Rule 10b-5 (17 C.F.R. § 240.10b-5); aiding and abetting liability for violations of Section 10(b) of the Exchange Act 15 U.S.C. § 78j(b) and Rule 10b-5 (17 C.F.R. § 240.10b-5); and violations of Section 17(a)(1)–(3) of the Securities Act 15

2

U.S.C. § 77q(a)(1)–(3).  The SEC seeks permanent injunctive relief enjoining Defendants

from future violations of securities laws, an officer-director bar against Duckson,

declaratory judgment as to Defendants' securities violations, disgorgement of ill-gotten

gains, civil penalties, and other relief the Court may deem appropriate.  (FAC ¶¶ 19,

Relief Requested.)

In April 2011, the Court denied Defendants True North Finance Corporation

("True North") and Owen Mark Williams' ("Williams") motions to dismiss, finding that

the SEC's Corrected Complaint (Doc. No. 4) satisfied the pleading requirements of

Federal Rule of Civil Procedure 9(b) and that the factual allegations in the Corrected

Complaint sufficiently plead scienter.  (Doc. No. 62 at 12–13.)  In May 2012, the SEC

was given leave to file its First Amended Complaint, which the Fund, TFFM, and

Duckson answered several weeks later.  (Doc. Nos. 95–99.)

## A.     The Parties

The Fund was a Delaware limited partnership and TFFM was a Minnesota limited

liability company; both were based in Minneapolis, Minnesota.  (FAC ¶¶ 26–27.)  In

2004, Timothy R. Redpath ("Redpath") and Michael W. Bozora ("Bozora") launched the

Fund to provide financing to Hennessey Financial, LLC and/or Hennessey Financial Note

Holdings, LLC (collectively, "Hennessey").  (*Id*. ¶¶ 32, 33, 36.)  Hennessey, which was

owned by Jeffrey Gardner ("Gardner") generated income for the Fund by making

mezzanine[1] loans at annual rates of 18% or greater to real estate developers including Heritage Development ("Heritage"), Argus Homes ("Argus"), Omni Investment Properties ("Omni"), and Assured Financial, LLC ("Assured") (collectively, "affiliated borrowers"), which were also owned and operated by Gardner.  (Doc. No. 141, Phillips Aff. ¶ 2, Ex. 2 (Redpath Dep. I) at 209–11.)  Heritage was the largest of Hennessey's affiliated borrowers, receiving approximately two-thirds of Hennessey's loans; Omni and Argus received nearly all of Hennessey's remaining loans.  (Phillips Aff. ¶ 9, Ex. 9 (Essen Dep.) at 84–85.)

NFP Securities, Inc. ("NFP") is a brokerage firm that brought in a majority of the Fund's investors.  (Phillips Aff. ¶ 14, Ex. 14 (Woodward Dep.) at 11.)  Prior to November 2008, Duckson did not speak with NFP or any of the Fund's actual or potential brokers or investors.  (Doc. No. 121, Duckson Decl. ¶ 3.)

The Fund offered its limited partners ("investors") a 12% fixed annual return and required them to lock-up their investment in the Fund for four years.  (FAC ¶ 36.)  The Fund paid its investors 1% per month, which was paid primarily from the interest it received from Hennessey and its affiliated borrowers.  (*Id.*; Phillips Aff. ¶ 1, Ex. 1 (Duckson Dep. I) at 40.)  Pursuant to the Fund's partnership agreement, any profits were maintained within the Fund as capital until the Fund's dissolution.  (Duckson Dep. I at 41.)

---

[1]    A mezzanine real estate loan is collateralized by a security interest in real estate that is subordinate to that of a senior lender.  (FAC ¶ 4.)

4

Until the end of 2008, Duckson was a capital partner at the Minneapolis office of Hinshaw and Culbertson, LLP ("Hinshaw").  (Duckson Decl. ¶ 2.)  In 2008, over two-thirds of Duckson's billable attorney fees were incurred on behalf of Gardner and his affiliates.  (Phillips Aff. ¶ 19, Ex. 19 (Hinshaw 30(b)(6) Dep.) at 23−29.)  On October 26, 2008, Duckson formed TFFM, which became the Fund's investment manager.  (Duckson Decl. ¶ 11.)  Duckson resigned from Hinshaw on December 31, 2008 to manage the Fund through TFFM "because he believed that the value of the Fund's real estate assets obtained through foreclosure on Hennessey Financial so far exceeded the Fund's liabilities" that he was sure to make a great deal of money.  (*Id*.)  Duckson served as CEO of True North from June 2009 to the end of 2010 when Duckson resigned and Steven Howard Levenson ("Levenson") took over as CEO.  (FAC at ¶ 94; Phillips Aff. ¶ 84, Ex. 84 (Levenson Dep.) at 9−10.)

TFFM, which was owned and controlled by Duckson, served as the investment manager to the Fund beginning in November 2008.  (FAC ¶ 27.)  As the Fund's investment manager, TFFM received a 2% annual management fee.  (Duckson Dep. I at 41.)  Through TFFM, Duckson oversaw the Fund's operating real estate assets, monitored cash flows, interacted with third parties doing business with the Fund, and evaluated investment opportunities, strategy, and asset management.  (Duckson Decl. ¶ 14.)  Duckson also served as the "Chief Manager and Governor" of the Fund's general partner, CS Fund General Partner, LLC.  (Field Aff. ¶ 3, Ex. 2 (November 2008

COM) at CAP 0227774.)[2]  The Fund's investment manager, TFFM, was responsible for overseeing "most decisions regarding the acquisition and sale of major investments by the Fund" and the "day-to-day management and operation of the Fund."  (*Id.*)

Duckson also formed Transactional Finance, LLC ("Transactional Finance") to provide additional investment opportunities for the Fund in the form of third-party promissory notes, which were issued in 2009.[3]  (Duckson Decl. ¶ 29.)  Transactional Finance was a part owner and holding company for TFFM.  (Phillips Aff. ¶ 8, Ex. 8 (Duckson Dep. II)[4] at 16–17.)  Though Duckson owned 100% of Transactional Finance as of May 2012, he had other ownership partners until approximately 2007 or 2008. (*Id.* at 17.)  Duckson also created CS Midwest Holdings ("CS Midwest") and CS Southeast Holdings ("CS Southeast") as special purpose vehicles ("SPVs") to which the Fund could sell assets in furtherance of the Fund's strategic objectives.  (November 2008 COM at CAP 0227776.)

---

[2]     For clarity, to the extent possible, the Court will refer to the Bates numbered pages of each document because the parties' memoranda cite repeatedly to the same key exhibits, many of which are not uniformly or sequentially paginated.

[3]     Transactional Finance did not profit from the third-party promissory note transactions it entered into with the Fund in 2009.  (Duckson Decl. ¶ 29.)

[4]     Though Exhibit 8 attached to the Phillips Affidavit (Duckson Dep. II) contains excerpts from the same May 16, 2012 deposition of Duckson attached as Exhibit 7 to the Carlson Affidavit (Duckson Dep. III), these exhibits will be cited separately because the deposition excerpts contained in each exhibit do not overlap.  Neither contains an unabridged version of the deposition.

**B.      Relevant Facts Prior to Period of Alleged Fraud**

Prior to July 2007, Jon Essen ("Essen"), Hennessey's CFO and COO, was aware that Heritage was experiencing financial difficulties as a result of the credit crisis and the downturn in the real estate market.  (Essen Dep. at 17–18, 50.)  By January 2008, Hennessey lacked the ability to repay its creditors.  (Phillips Aff. ¶ 20, Ex. 20 (Dixon Dep.) at 114.)  Due to deteriorating real estate market conditions, Argus and Assured also struggled to meet their financial obligations to Hennessey.  (Dixon Dep. at 54; Phillips Aff. ¶ 18, Ex. 18 (Richardson Dep.) at 44.)  By September 2007, Gardner had determined that the Fund would need to foreclose on Hennessey's assets.  (Phillips Aff. ¶ 5, Ex. 5 (Gardner Dep.) at 207–08.)

In November 2007, Duckson, Redpath, Bozora and several others held due diligence meetings with Gardner in Minneapolis, where they discussed Heritage, Hennessey, and the affiliated borrowers' financial struggles.  (Phillips Aff. ¶ 86, Ex. 86 (Regalia Dep.) at 19–23; Essen Dep. at 139.)  In a November 21, 2007 e-mail summarizing one of the due diligence meetings, Andy Regalia ("Regalia") outlined the group's three options for dealing with the associated borrowers' defaults:  immediately salvage them, attempt to take-on and manage them, or raise new funds while limiting liability and waiting for the market to rebound.  (Phillips Aff. ¶ 87, Ex. 87 at 2, CAP 0101597.)  Regalia also recounted the internal controls Duckson recommended and opined that such changes would be expensive and unlikely to succeed.  (*Id.*)

Duckson met with Gardner and Essen in January 2008 and February 2008 to discuss the Fund's financial status.  (Essen Dep. at 143–49.)  The meeting minutes reflect that strategies for protecting Hennessey's collateral were discussed in addition to prospects for raising additional capital.  (*Id.* at 143, 147.)  Hennessey's liquidity problems and inability to make payments to its unsecured creditors based on its cash flow were also discussed.  (*Id.* at 149.)  Duckson believed that a short-term liquidation of the Fund was not possible and that "a disorderly liquidation would not have been in the Fund investors' best interest."  (Duckson Decl. ¶ 9.)

### C.    Relevant Facts During Period of Alleged Fraud

In 2008, the global economy experienced an unprecedented downturn that had a profoundly negative effect on the real estate and credit markets.  The financial crisis resulted from the sudden drop in housing prices, which had obscured vulnerabilities in the subprime lending markets.  *How Did a Private Deal Turn Into a Federal Bailout?: Hearing Before the Subcomm. on Domestic Policy of the H. Comm. on Oversight & Gov't Reform*, 111th Cong. 19 (2009) (statement of Former Sec. Henry R. Paulson, Dep't of the Treasury).  Regulators and economists were blindsided by the housing market's severe decline.  *The Financial Crisis and the Role of Federal Regulators: Hearing Before the H. Comm. on Oversight & Gov't Reform*, 110th Cong. 24 (2008) (statement of Alan Greenspan, Former Chairman, Federal Reserve Board).  The market disruption and the subsequent loss of consumer confidence faded into the worst economic climate since the Great Depression.  *Monetary Policy and the State of the Economy: Hearing Before the H.*

*Comm. on Fin. Servs.*, 111th Cong. 7 (2009) (statement of Benjamin S. Bernanke, Chairman, Federal Reserve Board).

In March 2008, Hennessey voluntarily foreclosed upon several of its affiliated borrowers, including Heritage, which had defaulted on their payment obligations to Hennessey. (Doc. No. 98, Duckson Answer ¶ 6; Field Aff. ¶ 2, Ex. 1 (March 2008 COM) at CAP 0175109). Duckson believed this foreclosure was a positive event for Hennessey and the Fund because it meant an infusion of millions of dollars of equity. (Duckson Decl. ¶ 7.)

In May 2008, Hennessey defaulted on its payment obligations to the Fund and the Fund "voluntarily foreclosed" on Hennessey's real estate interests in June 2008. (Duckson Answer ¶ 7; Carlson Aff. ¶ 8, Ex. 7 (Duckson Dep. III) at 99.) Duckson, Bozora, and Redpath became aware of the default in approximately May 2008. (Duckson Answer ¶ 43.) Duckson viewed the Fund's foreclosure on the Hennessey assets as beneficial because he believed that Hennessey's equity in its real estate assets was "worth millions of dollars more than the liabilities on those properties." (Duckson Decl. ¶ 10.) Duckson asserted, "I never would have left Hinshaw if I did not believe that, separate and apart from the fee income, I had an opportunity to make a lot of money." (*Id.* ¶ 28.)

At meetings in New York and Dallas in late 2008 with approximately 25 brokers who sold the Fund to their clients, a "major portion" of Duckson's presentation was dedicated to the Hennessey foreclosure. (Field Aff. ¶ 48, Ex. 47 (Weisenberger Dep.) at 69–70 (Fish Dep.) at 67.) Additionally, Duckson specifically discussed and explained the

Hennessey foreclosure in a February 10, 2009 update letter[5] to brokers.  (Field Aff. ¶ 49, Ex. 48 at 1–2.)  After mid-November of 2008, seven new investors invested in the Fund. (Field Aff. ¶ 12, Ex. 11.)

In December 2008, NFP suspended offering the Fund to its customer pending the outcome of a third-party due diligence evaluation.  (Phillips Aff. ¶ 58, Ex. 58 (Aylieff Dep. II) at 320, 323−24.)  NFP permanently ceased offering the Fund to its customers in February 2009 after hiring an outside auditor and reviewing the Fund's financial health.  (*Id*. at 222−23, 377.)  A February 2009 letter that NFP provided for use to its brokers recounted the financial status of the Fund, including the Hennessey foreclosure and stated that NFP was "not participating in the distribution of the [February 2009 Series I] Notes."  (Carlson Aff. ¶ 17, Ex. 16 at NFP 166865–66.)  The letter did not, however, forbid brokers from recommending the Fund to their investors and recognized that some brokers might "believe the Notes represent a good investment opportunity" for investors who may be seeking a "distressed loan investment."  (*Id*. at NFP 166865.)

In February 2009, the Fund obtained an independent third-party appraisal of what the Fund perceived to be its most valuable real estate project, the Cape Haze Marina ("the Marina"), which was appraised at $46,000,000.  (Carlson Aff. ¶ 5, Ex. 4 at 11.)  In his notes summarizing his April 2009 conversation with Duckson and several others, broker David Dyer ("Dyer") wrote:

---

[5]     The February 10, 2009 letter was sent to brokers and the February 24, 2009 Update Letter was sent to investors.  *Compare* (Field Aff. ¶ 49, Ex. 48) *with* (Doc. No. 116, Carlson Aff. ¶ 34, Ex. 33.)  For clarity, the Court will cite to the Bates numbered pages of the February 24, 2009 letter.

> Todd has recently started [the] 3rd party appraisal process on all assets in [the] CS Fund. . . .  He has received 3rd party appraisal for [the] "best ½" of assets and appraisal is $40 Million for assets that had [an] original appraised value of $75 Million.  The original appraised values of all of the real estate is about $150 Million.  The other half will have 3rd part[y] appraisal completed in a few months and he expects appraisal value to be much lower than [the] 1st half group of assets—maybe in [the] $20–$25 Million range.

(Carlson Aff. ¶ 18, Ex. 17 at DY 001743.)  Several months later, in July 2009, Duckson

sent a letter to the Fund's investors stating, "Although appraising the value of real estate

is not an exact science, we are pleased to report a 2009 consolidated net asset value of

approximately $78,000,000 ("NAV")."  (Carlson Aff. ¶ 6, Ex. 5 at 1.)  Defendants have

not pointed the Court toward any evidence that the $78 million estimate was based on

independent third-party appraisals aside from the $46 million attributable to the Marina.

In March 2009, the Fund reduced its interest payment distributions to investors

from 12% to 6%.  (Duckson Dep. II at 233.)  In June 2009, the Fund announced that it

would cease making interest payments to its investors; the Fund merged with True North

in July 2009.  (*Id.* at 237; Duckson Decl. ¶ 20.)  True North filed a registration statement

with the SEC in October 2009; the SEC's subsequent correspondence made clear,

however, that the SEC would not allow True North's registration statement to become

effective.  (Duckson Decl. ¶ 21.)  In November 2009, the Fund's investors stopped

receiving interest payments; these payments did not resume.  (Doc. No. 140,

Saylor Aff. ¶ 13.)

### D.      Confidential Offering Memoranda and Confidential Information Memoranda

The SEC has defined the time period of fraud as March 2008 to December 2009.

(FAC ¶¶ 2–19.)  During this time period, the Fund issued four Confidential Offering

Memoranda ("COMs") in March 2008, November 2008, February 2009 (Series I Note

offering), and November 2009.[6]  The COMs provided information to the Fund's investors

for use in deciding whether to invest or reinvest in the Fund.  *See*, *e.g.*, November 2008

COM at CAP 0227730.  Each COM contained the following warning on its cover page:

> **THE [UNITS][7] OFFERED HEREBY INVOLVE A HIGH DEGREE
> OF RISK. . . .  PURCHASES OF [UNITS] ARE SUITABLE ONLY
> FOR PERSONS OF SUBSTANTIAL FINANCIAL MEANS WHO
> CAN MAKE A LONG TERM INVESTMENT, CAN BEAR THE
> RISK OF A COMPLETE LOSS OF THEIR INVESTMENTS IN THE
> FUND AND HAVE NO NEED FOR LIQUIDITY IN THEIR
> INVESTMENT.  THERE IS NO MARKET FOR THE [UNITS] AND
> NONE IS EXPECTED TO DEVELOP.  THE GENERAL PARTNER
> RESERVES THE RIGHT TO REJECT THE SUBSCRIPTION OF
> ANY PROSPECTIVE INVESTOR FOR ANY REASON.**

(March 2008 COM at CAP 0175083, November 2008 COM at 0227730, Field Aff. ¶ 4,

Ex. 3 (February 2009 COM) at 1; Carlson. Aff. ¶ 22, Ex. 22 (November 2009 COM) at

CAP 0325564) (emphasis in original).)  The COMS also contained sections entitled

---

[6]      Defendants assert that because the November 2009 COM was not mentioned in
the First Amended Complaint, the SEC's fraud claims as to this document do not satisfy
Rule 9(b).  For completeness, the Court summarizes the facts relevant to the November
2009 COM and addresses Defendants' 9(b) concerns in the Discussion Section below.

[7]      In the February 2009 COM and the November 2009 COMs, the term "unit" was
replaced with the term "Series I Notes."

"Risk Factors," Investment Objective and Strategy," and "Business," the contents of which varied slightly from COM to COM.

Each COM was accompanied by a Confidential Information Memorandum ("CIM"), which served as a summary of the information contained in each COM. (Doc. No. 126, Redpath Decl. ¶ 7; Duckson Dep. II at 78−79.)  During the alleged period of fraud, the Fund issued CIMs in March 2008, November 2008, and February 2009.  The SEC contends that these three documents contain fraudulent or misleading statements or omissions.

After October 2008, Duckson was the primary drafter of the COMs and CIMs as the principal of TFFM, the Fund's investment manager and general partner.  (Redpath Decl. ¶¶ 5, 8; Duckson Dep. II at 55−56.)  Duckson reminded the other individuals at the Fund participating in the drafting process that the content of these documents needed to be true and not misleading; Duckson asserted he was unaware of any misstatements or material omissions in any of these documents.  (Duckson Decl. ¶¶ 3, 5–6, 12–18.)  Though Duckson did not sign any of the COMs or CIMs and his name did not appear in the March 2008 COM, he was mentioned repeatedly in the November 2008 and February 2009 COMs.  (November 2008 COM at CAP 0227774–75; February 2009 COM at 35–36.)

After October 2008, Duckson and TFFM had "ultimate sign-off authority" on the COMs and CIMs before they were issued.  ((Redpath Decl. ¶¶ 6, 8); *see* (Duckson Dep. II at 51−54).)  The Fund's auditors, including the accounting firm Virchow Krause &

Company ("Virchow"), assisted with the preparation of the March 2008 COM and conducting performance audits.  (Duckson Decl. ¶ 8.)  After Virchow resigned, L.L. Bradford & Company ("Bradford") was retained as the Fund's auditor.  (Doc. No. 119 (Duckson Mem.) at 6.)  The November 2008 COM included a copy of a financial statement Bradford prepared on the Fund's behalf.  (Duckson Decl. ¶ 12.)

Each individual who invested in the Fund was required to sign a "Subscription Agreement," which indicated that the investor reviewed and understood the COM's terms and relied solely on its contents in deciding to invest.[8]  (March 2008 COM at CAP 0175176–77.)  Specifically, the Subscription Agreement provided that "[t]he Subscriber has relied on nothing other than the Memorandum and the Subscriber Agreements (including all exhibits and appendices thereto) in deciding whether to make an investment in the Partnership."  (*Id*. at CAP 0175177.)  In order to receive accreditation to invest in the Fund, investors had to satisfy the Fund's "Investor Suitability Standards," some of which included demonstrating a net worth of over $1 million or earning in excess of $200,000 in the previous two years.  (*Id*. at CAP 0175129.)  The Fund's approximately 450 investors consisted of nurses, retired individuals, teachers, multi-millionaires and real estate developers.  *Compare* (Field Aff. ¶ 10, Ex. 9 (Calton Dep.) at 101–03, (Fish Dep.) at 57, 59–60, (Sidder Dep.) at 186, (Amos Dep.) at 125); *with* (Doc. No. 124 (SEC

---

[8]  The SEC argues that these subscription agreements are inadmissible hearsay and should be disregarded for this reason.  The Court considers the SEC's arguments with respect to these documents in the Discussion Section to follow.

Response Mem. to Funds) at 4[9]) and (Phillips Aff. ¶ 29, Ex. 29 at TD0036578) (referring to "Ma and Pa Kettl[e]" investors).

      E.     **Marketing Materials: Update Letters and Q&A Sheet**

In addition to the aforementioned COMs and CIMs, the SEC also alleges that four documents consisting of marketing materials—the May 2008, October 2008, and February 2009 update letters and the February 2009 Question and Answer Sheet ("February 2009 Q&A Sheet")—contain fraudulent statements or omissions. (Doc. No. 125 (SEC Response Mem. to Duckson) at 21.) Though Gardner signed the May 2008 Update Letter, Bozora signed the October 2008 Update Letter in his capacity as the Fund's manager. (Carlson Aff. ¶ 31, Ex. 30 (May 2008 Update Letter) at 2; Carlson Aff. ¶ 32, Ex. 31 (October 2008 Update Letter) at 2.) Beginning in October 2008, Duckson "had ultimate sign-off authority on all marketing materials for the Fund." (Redpath Decl. ¶ 9.) Duckson signed the February 2009 Update Letters; the February 2009 Q&A Sheet was not signed, yet the Fund's name appeared in the document header and was mentioned throughout. (Carlson Aff. ¶ 34, Ex. 33 at 3, Field Aff. ¶ 49, Ex. 48 at 2 (collectively, February 2009 Update Letters); Carlson Aff. ¶ 35, Ex. 34 (February 2009 Q&A Sheet) at 1.)

---

[9]     The SEC did not provide specific page numbers or paragraph numbers in its summary listing of the declarations relevant to this factual assertion. As such, the Court cites generally to this portion of the SEC's brief.

## F.     Defendants' Allegedly Fraudulent Statements

The SEC has separated the purportedly fraudulent statements into nine categories.

Defendants refute the SEC's allegations following the same categorization and contend

that these statements were true and/or immaterial.  For clarity, the Court will lay out the

relevant facts based on these nine categories of statements or omissions.  To the extent

the SEC alleges that Defendants made fraudulent written or oral statements beyond the

aforementioned COMs, CIMs, and marketing materials, these allegations are also

included below.

### 1.     Risks that Had Already Occurred

The "Risk Factors" sections of the March 2008, November 2009, February 2009,

and November 2009 COMs contain several forward looking statements regarding the

impact of borrower default on the Fund:  "[a] default by any one borrower, issuer, or

collateral obligor could have a material adverse effect on the Fund's performance and

cause it to suffer substantial losses."  (March COM at CAP 0175097, November 2008

COM at CAP 0227745, February 2009 COM at 7, November 2009 COM at CAP

0325578.)  The COMs also warned that under certain circumstances, the Fund may be

unable to repurchase defaulted loans:

> Were there to be a default on numerous Notes, [or Fund loans,] within a
> short period of time, and the Borrower[10] [or Placement] was unable to
> purchase such Notes, cure such loan defaults or renew the Irrevocable
> Letters of Credit, it is possible that the aggregate amount of the Irrevocable

---

[10]     The November 2008 inserts "Southeast Holdings" in place of the term
"Borrower."  (*Id.* at CAP 0227745–46.)

> Letters of Credit would be insufficient to repurchase . . . the defaulted
> Notes or repay the defaulted loans.

(March COM at CAP 0175097; November 2008 COM at CAP 0227745–46; February

2009 COM at 8; November 2009 COM at CAP 0325579.)  The February 2009 and

November 2009 COMs contain two additional sentences addressing the risk of default:

> [D]ue to the current state of the economy, the Fund has currently suspended
> its historical practice of requiring Borrowers to post Irrevocable Letters of
> Credits as credit enhancements to Notes.  Until such time as the practice is
> restored, if ever, Notes are generally not supported by any credit
> enhancement.

(February 2009 COM at 8; November 2009 COM at CAP 0325579.)  Additionally, the

COMs state that "[t]o the extent [the Fund's credit impaired] obligors become insolvent,

and the collateral underlying the particular notes is insufficient, the Fund will suffer

losses and the Limited Partners[11] may lose some or all of their investment."  (March 2008

COM at CAP 0175103; November 2008 COM at CAP 0227751; February 2009 COM at

13; November 2009 COM at CAP 0325584.)

In March 2008 Hennessey voluntarily foreclosed upon several of its affiliated

borrowers, including Heritage, which had defaulted on their payment obligations to

Hennessey.  (Duckson Answer ¶ 6.)  In May 2008, Hennessey defaulted on its payment

obligations to the Fund and the Fund "voluntarily foreclosed" on Hennessey's real estate

interests in June 2008.  (*Id.* ¶ 7; Duckson Dep. III at 99.)  None of the COMs' "Risks

Factors" sections stated that Heritage and Hennessey were in "default," though this was

---

[11]     The February 2009 COM uses the term "Note Holders" rather than "Limited
Partners."

undoubtedly the case when the November 2008, February 2009, and November 2009

COMs were issued.  However, the last pages of the "Notes to Financial Statements"

sections of the November 2008 and February 2009 COMs under the category

"Subsequent Events" state:

> In May 2008, [Hennessey] **failed to meet certain economic covenants** and all loans became non-performing.  In June 2008, the Partnership foreclosed on all assets of [Hennessey].  Through this foreclosure, the Partnership now has ownership to the properties funded by [Hennessey], subject to senior lenders.
> . . . .
> Management is in the process of reviewing the properties of [Hennessey] obtained through foreclosure.  The process includes assessing the values of the related properties, including obtaining appraisals, to determine which assets will be kept or abandoned.  If the assets are determined to have adequate value by management, the Partnership will assume any related debt on the properties held by senior lenders.

(November 2008 COM at CAP 0227840; February 2009 COM, Notes to Financial

Statements, at 10 (emphasis added).)

In November 2008, Duckson and the Fund's then-CFO, Williams, discussed

Duckson's change to Williams' proposed language describing the Hennessey default.

Williams proposed the language, "Hennessey Financial failed to make their monthly

interest payment."  (Phillips Aff. ¶ 77, Ex. 77 at TD 0044955–57.)  Duckson preferred

the language that appeared in the November 2008 and February 2009 COMS indicating

that Hennessey had "failed to meet certain economic covenants."  (Duckson Dep. II at

156–160; Phillips Aff. ¶ 77, Ex. 77 at TD 0044955–57; November 2008 COM at CAP

0227840; February 2009 COM, Notes to Financial Statements at 10.)  When asked why

he made this change, Duckson testified, "I don't recall specifically but generally maybe

they didn't get an environmental audit on this property or perhaps there was some ratio or covenant out of line."  (Duckson Dep. II at 160.)

## 2.      Fund's Purportedly Failed Investment Strategy

The Fund's investment strategy was to loan money to Hennessey, a mezzanine real estate lender, which enabled Hennessey to make loans to real estate developers including Heritage.  (Carlson Aff. ¶ 2, Ex. 1. Essen Dep. II at 20.)  The developers would then use the funds to acquire and develop raw land.  (*Id*.)  Upon completing improvements to the land and after obtaining government entitlements, Heritage would sell the land and use the proceeds to repay Hennessey, which would in turn repay the Fund.  At all times, the Fund's ability to pay its investors was contingent upon the sale of the underlying real estate.  (Doc. No. 115 (Funds' Mem.) at 9–10.)  In most instances, the Fund's interest in the real estate assets was subordinate to that of senior lienholders. (March 2008 COM at CAP 0175107.)

The "Investment Objective and Strategy" section of the March 2008 COM stated:

> Management of the Fund believes that the slowing real estate market has deterred competition for mezzanine loans, thereby providing an opportunity for the Fund to make loans with a greater yield, better covenants and at a loan-to-value ratio that will increase when the real estate market recovers . . . .  Management believes that if the Fund waits to make loans or purchase Notes until the real estate market improves, traditional lenders will step in and the Fund will lose the opportunity to finance numerous quality projects.

(*Id*. at CAP 0175105–06.)  The November 2008, February 2009, and November 2009 COMs expressed the Fund's "modified" strategy of taking undervalued real estate as

collateral in regions where the investment manager predicted the real estate market would recover quickly.  (November 2008 COM at CAP 0227753; February 2009 COM at 16; November 2009 COM at 0325587.)

The March 2008, November 2008, and February 2009 CIMs emphasized the benefits and opportunities created by the credit crisis and the downturn in the real estate market and asserted that "the known high quality of management" reduced the Fund's "risk of default."  (Phillips Aff. ¶ 71, Ex. 71 (March 2008 CIM) at AS 004883; Phillips Aff. ¶ 73, Ex. 73 (November 2008 CIM) at 11; Phillips Aff. ¶ 75, Ex. 75 (February 2009 CIM) at AS 005071.).

The May 2008 Update Letter analyzed the global financial crisis in a positive light:

> While we believe that the worst is over in the financial/credit market, there will still be some dislocation going forward primarily because [of] the overall U.S. economy, which is clearly slowing. . . .  These changes in the credit markets are creating higher demand for non-traditional lenders like [Hennessey].

(*Id*. at 1.)  The October 2008 Update Letter stated that the credit crisis was a "relatively short-lived phenomenon" that "creates an extraordinary opportunity for the Fund to bring fresh capital selectively to markets which are currently underserved."  (October 2008 Update Letter at 2.)  Similarly, the February 2009 Q&A Sheet maintained that the credit crisis provided the Fund with "immediate opportunities to assume the role as senior lender (without sacrificing returns) or purchase senior loans at a substantial discount from regional banks."  (February 2009 Q&A Sheet at 1.)  The February 2009 Update Letters touted the Fund's "significant and beneficial changes" that occurred in 2008, including

the Fund's takeover of Hennessey's assets through "the voluntary foreclosure process," and stated that the global financial crisis provided the Fund with "unprecedented investing opportunities." (February 2009 Update Letter at NFP 162189.)

In an April 2008 e-mail from Redpath to Bozora that was forwarded to Duckson, Redpath described the Fund's collateral as in "good shape" and the interest reserves as "where they need to be." (Phillips Aff. ¶ 29, Ex. 29 at TD0036578–79.) Redpath concluded, "This is a [g]reat story for us to tell [investors] and it's real." (*Id*. at TD 0036578.)

In contrast, in a May 14, 2008 letter to Hennessey's investors, including Duckson, Gardner described the "grave" situation in which Hennessey found itself where it "cannot survive these current [market] conditions or continue to make monthly payments to our investors." (Phillips Aff. ¶ 37, Ex. 37 at TD 0009149.) Gardner expressed his "deepest regret and dread" in sharing the "dismal news" of the upcoming foreclosure sale of Hennessey's assets to the Fund. (*Id*. at TD 0009150.)

An October 2009 SEC filing Duckson signed on behalf of True North stated that the Fund "faltered in a bear market." (Phillips Aff. ¶ 57, Ex. 57 at 2.) He also stated that due to the real estate market collapse, the Fund's borrower (Hennessey) "defaulted on its obligations to the Fund" and that the Fund's "legacy investment portfolio" was not providing a "current yield." (*Id*.) The Fund's new investment strategy, including creating "investment pods" to focus on distressed real estate finance was also described. (*Id*.)

### 3.     Foreclosure Terminology

In May 2008, Hennessey defaulted on its payment obligations to the Fund and the

Fund foreclosed on Hennessey's real estate interests in June 2008 through a "Voluntary

Surrender Agreement."  (Carlson Aff. ¶ 7, Ex. 6 at 1; Duckson Answer ¶ 7; Duckson

Dep. III at 99.)  The March 2008 COM described the transaction in the last paragraph of

a section entitled "Investment Strategy; Loan Purchase and Servicing Agreement and

Loan Security Agreement" as follows:

> Borrower intends to sell a portion of its interest in the Heritage Loan
> Agreement to J-WMW, LLC, a Minnesota limited liability company owned
> and controlled by Jeffrey A. Gardner ("J-WMW"). . . .  The portion of the
> Heritage Loan Agreement purchased by J-WMW from Borrower grants
> J-WMW the right to sell the **Voluntarily Surrendered Collateral** in a
> public auction.  J-WMW intends to bid at such auction in an effort to own
> and control the **Voluntarily Surrendered Collateral**.  The obligations of
> the Heritage Borrowers to Borrower, including the **Voluntarily**
> **Surrendered Collateral** entities, will not be impacted nor will any
> Borrower security interest on real estate be satisfied or forgiven via the sale.

(March 2008 COM at CAP 0175109 (emphasis added).  The February 2009 Update

Letters provided a similar description of the Hennessey foreclosure, "[i]n May 2008,

concerns about affiliated party risk and counter party creditworthiness led the Fund to

enter into a voluntary foreclosure process with [Hennessey] to acquire all of its assets."

(February 2009 Update Letter at NFP 162189.)  The letters further explained that the

Fund assumed Hennessey's equity in the underlying properties and extinguished

Hennessey's debts to the Fund.  (*Id.*)  The letters also predicted, "[i]f real estate

valuations rebound, and the Fund projects they will, this project level equity interest may

potentially provide substantial upside profit for the Fund."  (*Id.*)

In a summer 2009 conference call between NFP broker Kathy Fish ("Fish") and

the Fund's Managing Director, M. David Woodward ("Woodward"), Fish expressed her

dismay with not learning of the foreclosures until late 2008:

> You know, it had to be pulled out, basically at that due diligence meeting,
> that the fund had been foreclosed upon.  You know, you guys weren't
> really up front about that until one of us asked a question that sounds like
> this is a foreclosure or whatever . . . .  I just feel like I have been duped and
> to not have full disclosure and information when we are suggesting
> something to our clients. . . .  [W]e didn't know for six or seven months
> after the foreclosure occurred that it had even occurred.

(Phillips Aff. ¶ 49, Ex. 49 at 1.)  Later in the conversation, Woodward acknowledged that

the Fund was "upside down" when Redpath and Bozora sold the general partnership to

Duckson."  (*Id*. at 5.)  He added, "[s]o there was really no inherent value that [the general

partners] could sell and make any gain off of."  (*Id*.)

### 4.    Fund's Credit Bid for Hennessey's Assets

In August 2008, the Fund acquired Hennessey's assets at a public auction where

the Fund, the only bidder, made a $55 million credit bid.  (Duckson Dep. I at 77–78.)

The bid eliminated Hennessey's outstanding loans to the Fund.  (*Id*. at 77.)  The

"Business" sections of the November 2008 and February 2009 COMs[12] described this

transaction as follows:

> A significant portion of the current collateral underlying the Notes is
> derived from the collateral obtained by the Fund's foreclosure on

---

[12]    Though the SEC's memorandum argues that the Fund's credit bid was also
mentioned in the November 2009 COM, after careful review, the Court could not find
this reference, nor did the SEC provide a page number where this information can be
found.  *Compare* (Doc. No. 124 (SEC's Response Mem. to Funds) at 40) *with* (November
2009 COM).

[Hennessey] and J-WMW, LLC, previous Fund borrowers.  The Fund
obtained the collateral in August, 2008 via public sale, bidding
$55,000,000.

(November 2008 COM at CAP 0227764; February 2009 COM at 26.)

### 5.    Fund's Loans to CS Midwest and CS Southeast

Duckson formed CS Midwest and CS Southeast to "compartmentalize" the real

estate assets the Fund acquired after foreclosing on Hennessey.  (Phillips Aff. ¶ 10, Ex.

10 (Redpath Dep. II) at 118.)  The Loan Security Agreement between the Fund and CS

Midwest and CS Southeast required these SPVs to pay interest on any money they

borrowed from the Fund.  (Phillips Aff. ¶ 90, Ex. 90 at TD 0001642.)  Though the Fund

transferred money to CS Midwest and CS Southeast in November 2008, no interest

payments or transfers back were made to the Fund until September 2009.  (Saylor Aff.

¶ 24.)

The November 2008 COM identified CS Midwest and CS Southeast as borrowers

of the Fund.  (November 2008 COM at 227745.)  The "Risk Factors" sections of the

November 2008, February 2009, and November 2009 COMs contained three paragraphs

under the heading "Dependence on Jaguar Financial,[13] Midwest Holdings and Southeast

Holdings," which stated that the Fund's investment manager sought to pursue its

investment objectives "by making loans to Midwest Holdings, Southeast Holdings, and

---

[13]     Jaguar Financial Corporation ("Jaguar") was an SPV owned by Gardner.

Jaguar Financial[14]" and that the Fund's success was dependent upon "the abilities of these entities to initiate eligible financing transactions."  (November 2008 COM at CAP 227746; February 2009 COM at 8; November 2009 COM at CAP 0325579.)  Similarly, the November 2008 CIM stated that "the Fund will receive Fund Secured Notes from Jaguar Financial Corporation, CS Midwest Holdings, LLC, CS Southeast Holdings, LLC, or other third-party entities (collectively "SPV")."  (November 2008 CIM at 3.)  The COMs did not include any statements about the effect of the Hennessey foreclosure on the Fund's ability to make loans to CS Midwest and CS Southeast.

### 6. Using New Investors' Funds to Pay Expenses and Existing Investors

The COMs state that "[t]he Fund's sole source of liquidity is the Notes or Fund loans."[15]  (March COM at CAP 0175099; November 2008 COM at CAP 0227747; February 2009 COM at 9; November 2009 COM at CAP 0325580.)  The "Custodian Agreements" sections of November 2008, February 2009, and November 2009 COMs contain a list of nine categories of expenses or obligations that could be paid from Fund's Cash Account including:

---

[14]     The November 2009 COM did not include Jaguar Financial in the list of entities to which it planned to make loans.  (November 2009 COM at CAP 0325579.)

[15]     The November 2008, February 2009, and November 2009 COMs substitute the term "investments" for the term "loans."

     i.      the Collateral Account for Note funding or Real Estate investments;

     ii.     the Fund to pay any return of a Capital Accounts, or any portion thereof, to Limited Partners[16],

     iii.    out of pocket cost reimbursement to the General Partner or Investment Manager,

     . . . .

     viii.   other operating expenses of the Fund, such as servicing fees and costs paid to the Borrowers, approved by the Investment Manager or General Partner;

     ix.    Priority Distributions

(November 2008 COM at 0227765–66; February 2009 COM at 27–28; November 2009 COM at CAP 0325599.)  The COMs do not specify what percentage of the Fund's operating cash flows would be dedicated to paying expenses on the real estate acquired from Hennessey or interest payments to its existing investors.  After the Fund foreclosed on Hennessey, nearly all of the Fund's resources were put towards paying the expenses associated with maintaining the real estate assets it acquired from Hennessey and its obligations to senior debt holders and limited partners.  (Gardner Dep. at 340–44; Saylor Aff. ¶¶ 21–22.)  Through 2009, the Fund raised $74 million from its investors.  (Saylor Aff. ¶ 16.)

### 7.    First Commercial Bank Lawsuit

In June 2008, First Commercial Bank ("FCB"), a Minnesota state bank in Bloomington, Minnesota, filed a seven-count complaint against Hennessey, Gardner, and

---

[16]    The November 2009 COM uses the term "Note Holders" rather than "Limited Partners."  (November 2009 COM at CAP 0325599.)

several other related entities seeking a $788,385 judgment, an injunction against any further transfers from Hennessey to the Fund, and several other requests for relief. (Phillips Aff. ¶ 45, Ex. 45 at 10–11.)  FCB contended that it had a senior possessory security interest in Hennessey's assets.  (*Id*.)  The Fund filed a counterclaim to collect on the letters of credit that FCB had issued to the Fund.  (Duckson Dep. II at 226–27.)

The November 2008 and February 2009 COMs described the lawsuit as follows: "The Fund is currently in litigation to collect certain Irrevocable Letters of Credit issued to it in the approximate amount of $1,300,000.  While outcomes in litigation are uncertain, [t]he Fund and its legal counsel expect a favorable result."  (November 2008 COM at CAP 0227770; February 2009 COM at 32.)  The November 2009 COM did not appear to mention the FCB lawsuit in the section on legal actions pending against the Fund.  *See* November 2009 COM at CAP 0325598.  Without citing FCB's claims to the underlying collateral, the February 2009 Update Letters asserted that the Hennessey foreclosure enabled the Fund to "take ownership of not only mezzanine level notes themselves but also the equity interest held by the developer in each real estate project." (February 2009 Update Letter at NFP 162189.)

When asked why these documents did not contain information regarding FCB's claims against the Fund, Duckson testified that he believed that FCB's claims were "frivolous [and] immaterial."  (Duckson Dep. II at 227.)  The case settled in December 2010 for an undisclosed amount.  (Phillips Aff. ¶ 46, Ex. 46 (Schomack Dep.) at 22.)

### 8.    Interest Reserve Account Amount

The November 2008 COM and CIM asserted that the Fund's interest and

redemption reserve had a current balance of "approximately $8,000,000" consisting of

"cash and other assets with short term liquidity."  (November 2008 COM at CAP

0227763; November 2008 CIM at 10.)  When the November 2008 COM and CIM were

issued, the Fund asserted that the $8 million figure consisted of $2.9 million in cash

balances in two bank accounts, approximately $2.3 million in available letters of credit,

approximately $500,000 of cash in escrow accounts, and approximately $2.3 million in

receivables.  (Phillips Aff. ¶ 78, Ex. 78 at 2–3; Phillips Aff. ¶ 44, Ex. 44 (Engstrom Dep.)

at 52–56.)  In November 2008, Duckson directed the Fund to close several interest

reserve accounts and redirect funds to the SPVs.  (Phillips Aff. ¶ 51, Ex. 51 at

TD0005884; Phillips Aff. ¶ 52, Ex. 52 at TD0012416.)

Fish testified that the amount of interest in the Fund's cash escrow was important

to her because it could provide a "cushion for my clients if something happened, they had

money there to continue paying dividends."  (Phillips Aff. ¶ 12, Ex. 12 (Fish Dep. II) at

152.)  Fish recalled being informed in December 2008 that the interest reserve had

sufficient funds to pay investors more than one year of interest.  (*Id*. at 152–53.)

### 9.    Gardner's Background

The March 2008 COM and CIM and the February 2009 CIM summarized

Gardner's thirty years of experience as a real estate developer and financier.  (March

2008 COM at CAP 0175123; March 2008 CIM at AS 004906; February 2009 CIM at AS

005078.)  Though these documents cited Gardner's position as President of Heritage[17]

and founder and CEO of Assured and Omni, they did not mention that these entities went

out of business in 2008.  (*Id.*)  Defendants do not dispute that these Gardner entities were

no longer going concerns as of late 2008.

### G.  Investors and Brokers' Understanding of Events Affecting the Fund

From 2007 to 2009, the Fund's brokers and investors had varying levels of

awareness of the financial troubles the Fund faced.  Thirteen investors asserted that they

were unaware that the Heritage or Hennessey defaults and foreclosures had taken place

until they ceased receiving interest payments from the Fund.[18]  (Doc. No. 127, Bredesen

Decl. ¶¶ 8–9; Doc. No. 128, Dorman Decl. ¶¶ 6, 13–14; Doc. No. 129, Feblowitz Decl.

¶¶ 8–9; Doc. No. 130, Greif Decl. ¶¶ 7–8; Doc. No. 131, Johnston Decl. ¶¶ 6–7; Doc.

No. 132, Kleinke Decl. ¶¶ 12–13; Doc. No. 133, Lefkove Decl. ¶¶ 7, 9; Doc. No. 134,

Meier Decl. ¶ 7; Doc. No. 135, Mitchell Decl. ¶¶ 5–6; Doc. No. 136, Nourse Decl. ¶¶ 6,

11–12; Doc. No. 137, Prewitt Decl. ¶¶ 7–8; Doc. No. 138, Shoor Decl. ¶¶ 5, 10–11; Doc.

No. 139, Stabile Decl. ¶¶ 6, 7, 9.)  Though these investors acknowledged reading some of

the COMs and update letters, they were not aware that the Fund was not receiving

---

[17]     The March 2008 CIM and February 2009 CIM refer to Gardner in the past tense as President of Heritage, whereas the March 2008 COM used the present tense.  (March 2008 COM at CAP 0175123; March 2008 CIM at AS 004906; February 2009 CIM at AS 005078.)

[18]     Defendants argue that the sham affidavit doctrine prevents the Court from considering these purportedly non-credible declarations.  The Court will address this issue in the section to follow.

income from its affiliated borrowers.  (*Id*.)  They also asserted that this information

would have been relevant to their decision to continue investing in the Fund.  (*Id*.)

Five brokers who sold the Fund to their clients testified that despite reviewing the

Fund's various COMs and update letters, they were unaware of the defaults in 2008 until

many months later and would have considered this information relevant to the

recommendations they made to their clients regarding the Fund.  (Phillips Aff. ¶ 12,

Ex. 12 (Fish Dep.); Phillips Aff. ¶ 92, Ex. 92 (Amos Dep.); Phillips Aff. ¶ 93, Ex. 93

(Horowitz Dep.); Phillips Aff. ¶ 94, Ex. 94 (Westerman Dep.); Phillips Aff. ¶ 95, Ex. 95

(Sidder Dep.).)[19]  In several e-mails to her clients in December 2008, Fish stated that

after attending a due diligence meeting earlier that month, she believed that the Fund was

"well positioned to take advantage of the current market conditions" and that her clients

could obtain additional income by investing further in the Fund.  (Phillips Aff. ¶ 59,

Ex. 59 at NFP 043312; Phillips Aff. ¶ 60, Ex. 60 at NFP 043280.)

In an October 2008 conference call, Redpath, Bozora, and Weisenberger informed

NFP brokers Kenny Miller ("Miller"), Paula Benyei ("Benyei"), Andrew Brief ("Brief"),

and Bhavin Mehta ("Mehta") that though the Fund had "foreclosed" on Hennessey's

assets, it held collateral in excess of its liabilities.  (Carlson Decl. ¶ 13; Carlson Aff. ¶ 27,

Ex. 26 at 5.)  Several brokers, including Brief and Mehta, asked follow-up questions

---

[19]     The SEC did not provide specific page numbers as to portions of these depositions
that support these assertions.  The Court has reviewed the testimony contained in these
exhibits and finds support for the general proposition that these brokers were unaware of
the Fund's financial troubles despite reviewing the Fund's COMs, CIMs, and marketing
materials.

regarding the Hennessey foreclosure.  (Carlson Aff. ¶ 27, Ex. 26 at 7–8, 11–12.)  In response to a question from Brief as to whether Bozora felt "pretty secure with the prospects of the [F]und" in the next six to twelve months, Bozora responded, "Absolutely. . . .  [w]e feel quite good about it.  We feel very good about our collateral." (*Id.* at 9.)

Three NFP brokers testified that they thought that the Fund's material risks and financial status were adequately disclosed.  NFP broker Karen Joy Bean ("Bean") testified that she believed that all of the material risks, terms, and conditions of the Hennessey foreclosure were disclosed in writing and that the Fund's downfall was a result of the recession.  (Carlson Aff. ¶ 16, Ex. 15 (Bean Dep.) at 356–57.)  Andrew Rosenberg ("Rosenberg") also acknowledged knowing the inherent risks of the Fund's real estate investment strategy and testified that he knew of the Hennessey foreclosure when it took place and that (Carlson Aff. ¶ 14, Ex. 13 (Rosenberg Dep.) at 359–61, 450.) Similarly, broker Brian Aylieff ("Aylieff") recognized the risks based on the Fund's investment strategy, acknowledged being informed of these risks in writing, and believed that the Fund's downfall was a result of the recession.  (Carlson Aff. ¶ 15, Ex. 14 (Aylieff Dep. Vol. 1) at 413, 417–19, 441–42.)

In April 2009, Duckson told brokers Ellen, Marsh, and Dyer that the Fund was contemplating abandoning its interest in up to half of its real estate parcels and that the assets in the Fund were not providing interest income or cash flow.  (Field Aff. ¶ 50, Ex. 49 at DY001743.)  Dyer wrote in his notes following the conversation:

> [Duckson] plans to generate cash [flow] by selling off the assets to pay the
> interest payments to [the] 10% holders and to provide liquidation payments
> for people who roll out after 4 years. . . .  He plans to keep the fund open
> for 4 more years, then sell off all assets over that time frame and liquidate
> the fund.

(*Id.*)  Dyer testified that Duckson did not conceal that the Fund's assets were not

providing income or cash flow and that he found Duckson's communication on this issue

to be "very transparent."  (Field Aff. ¶ 50, Ex. 49 (Dyer Dep.) at 188.)  Additionally, in a

March 2010 letter to two of his clients, former NFP broker Lawrence Adamo ("Adamo")

explained the contents of one of the February 2009 Update Letters and the February 2009

Series I Notes offering, opined that the Fund's financial deterioration was a result of the

global recession, and stated his "cautiously optimistic" belief that the Fund (at that time

True North) would be financially sound after the SEC approved their bond offering.

(Doc. No. 148, Second Carlson Aff. ¶ 2, Ex. 37 at SEC-MH 0000229.)

## H.      Duckson's Activities After Leaving True North

Since resigning from True North, Duckson has not worked for or provided advice

to any publicly traded companies, nor has he sought to become an officer of any publicly

traded companies in the United States.  (Duckson Decl. ¶¶ 22, 23.)  Duckson has not

previously been found to be in violation of securities laws, nor have securities regulators

charged him with any misconduct prior to this case.  (*Id.* ¶ 24.)  Duckson further asserts

that in the future, he will not violate securities laws.  (*Id.* ¶ 25.)  None of the Fund's

investors have sued him for misconduct arising out of any of the Fund's offering or

marketing documents or any other conduct relating to the Fund.  (*Id.* ¶ 24.)  Duckson

contends that as a result of this case and the downfall of True North, he has incurred

significant economic losses and his reputation and future prospects have been irreparably

damaged.  (*Id.* ¶¶ 30–33.)  TFFM earned approximately $6 million in management fees

under the management agreement between the Fund and True North, $3 million of which

were actually paid to TFFM and Duckson.  (*Id.* ¶ 26.)

## I.    Duckson's Defamation Lawsuit Against Clouser

In June 2011[20], Duckson filed a lawsuit in Scott County District Court asserting a

defamation claim against Christopher E. Clouser ("Clouser"), who became CEO of True

North after Duckson resigned, seeking judgment "in an amount in excess of $50,000."

(11cv1647 Doc. No. 1, Ex. A (Compl.) at 4.)  The complaint alleged that, "[o]n or about

February 22, 2011 through May 24, 2011, Defendant Clouser published a series of

defamatory e-mails [about Plaintiff] to numerous associates of Plaintiff."  (Compl. ¶ 12.)

On June 24, 2011, Clouser removed the action to this Court, citing diversity of

citizenship between the parties and "an amount in controversy greater than $75,000.00."

(Doc. No. 1 at 1.)  This Court granted Duckson's motion for remand in November 2011;

the action is no longer pending before the Court.  (Civil No. 11-1647, Doc. Nos. 26, 29.)

## DISCUSSION

## I.    Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

Court must view the evidence and the inferences that may be reasonably drawn from the

---

[20]    Based on the filing dates on the docket, the "June 1, 2001" dates on the Complaint
and Summons appear to be in error.

evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at 747.  The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    Scope of Fraud Claims

### A.    Effect of Subscription Agreements

Defendants[21] argue that because all of the Fund's investors signed Subscription Agreements explicitly stating that they did not rely on any statements beyond the

---

[21]    The three defendants moving for summary judgment, the Fund, TFFM, and Duckson promulgate their arguments and join in the arguments of other defendants.  As such, the Court will refer to Defendants' arguments collectively though they have been asserted by one of the three parties because these arguments apply to the three moving parties.

materials contained in the COMs (non-reliance clause), the statements beyond those contained in the COMs are immaterial as a matter of law.[22]  In support of this proposition, Defendants rely on several private securities cases in which the courts of appeals for the First Circuit, Second Circuit, Seventh Circuit, District of Columbia Circuit, and the district court for the Southern District of New York held that non-reliance clauses precluded recovery for alleged oral misrepresentations made prior to the signing of a non-reliance clause.  *Rissmann v. Rissmann*, 213 F.3d 381, 384 (7th Cir. 2000) ("[A] written anti-reliance clause precludes any claim of deceit by prior representations."); *Harsco Corp. v. Segui*, 91 F.3d 337, 342–43 (2d Cir. 1996) (affirming district court's determination that non-reliance warranty clause precluded finding of plaintiff's reliance on additional statements); *Jackvony v. RIHT Fin. Corp.*, 873 F.2d 411, 416 (1st Cir. 1989) (holding that merger clause prevented plaintiff from proving reliance on "pre-Agreement statements"); *One-O-One Enter., Inc. v. Caruso*, 848 F.2d 1283, 1285–86 (D.C. Cir. 1988); *Frati v. Saltzstein*, No. 10-3255, 2011 WL 1002417, at *3 (S.D.N.Y. Mar. 14, 2011); *San Diego Cnty. Emps. Ret. Ass'n v. Maounis*, 749 F. Supp. 2d 104, 120–21 (S.D.N.Y. 2010).

The SEC contends that Defendants' arguments based on the aforementioned private securities cases are misplaced because reliance is not an element of the SEC's claims, which are brought on the public's behalf.  The SEC argues that the Subscription

---

[22]    Defendants' additional arguments as to materiality are addressed in Section III.

Agreements are inadmissible hearsay and do not prevent the Court from considering statements relevant to its fraud claims beyond those contained in the COMs.

The Court finds Defendants' arguments limiting the scope of the SEC's claims to the COMs based on the non-reliance clauses of the Subscription Agreements unavailing. Aside from the fact that none of the cases the Defendants cite are mandatory authority, they are distinguishable because these private securities actions involved reliance on primarily oral representations or statements that were made prior to the signing of a non-reliance clause. In contrast, this case involves claims brought by the SEC for which reliance is not a required element. *See SEC v. Shanahan*, 646 F.3d 536, 541 (8th Cir. 2011) (*Shanahan I*) (explaining that to prevail on § 10(b), Rule 10b-5, or § 17(a) claim, the SEC must prove that Defendant "made a material misstatement or omission in connection with the offer, sale, or purchase of a security by means of interstate commerce" with the requisite intent) (citing *SEC v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007)). As the Eighth Circuit explained in *In re K-tel Int'l, Inc. Sec. Litig.*, 300 F.3d 881, 888 (8th Cir. 2002), in a private action for securities fraud, causation is "often analyzed in terms of materiality and reliance." In a private securities case where a plaintiff signed a subscription agreement, non-reliance clause, or integration clause, limiting fraud claims to those contained in offering documents may be appropriate. However, the Court declines to do so here because reliance is not a required element of any of the SEC's claims against Defendants. *Cf. Pinnacle Commc'ns Int'l, Inc. v. Am. Family Mortg. Corp.*, 417 F. Supp. 2d 1073, 1089 (D. Minn. 2006). Moreover, most of the additional alleged misstatements or omissions are written statements that are also contained in CIMs

36

or marketing materials that were issued simultaneously to or shortly after the COMs. In contrast, nearly all of the statements at issue in the cases Defendants cite were oral. Further, the First Amended Complaint contained specific allegations as to misstatements or omissions beyond those found in the COMs.

Although the Court notes that these Subscription Agreements could conceivably be considered hearsay depending on the purpose for which they were being offered into evidence, and, therefore, could be inadmissible, the Court lacks a sufficient basis to make such a finding or ruling prior to trial. *Cf. Pink Supply Corp. v. Hiebert, Inc.*, 788 F.2d 1313, 1319 (8th Cir. 1986) ("[W]ithout a showing that admissible evidence will be available at trial, a party may not rely on inadmissible hearsay in opposing a motion for summary judgment".). Thus, in the Court's materiality analysis, the Subscription Agreements will be considered as part of the "'total mix' of information made available [to reasonable investors]." *Matrixx Initiatives v. Siracusano*, 131 S. Ct. 1309, 1318 (2011) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 238 (1988)). Additionally, because many genuine issues of material fact exist with respect to the truthfulness and materiality of statements contained in the COMs, CIMs, and marketing materials, limiting the Defendants' liability to statements contained in the COMs would be premature. The Court, therefore, reserves the right to decide at trial issues as to the impact and admissibility of the investors' signing of the Subscription Agreements.

### B.     November 2009 COM

Defendants argue that the Court should not find the November 2009 COM to be within the scope of the SEC's claims because the First Amended Complaint does not

specifically mention this document.  Defendants allege that the SEC merely added claims based on the November 2009 COM after Defendants pointed out in their memoranda that the SEC did not previously make specific claims about this COM.  Defendants further contend that to allow the SEC to assert claims based on the November 2009 COM would violate the heightened pleading requirements of Rule 9(b) and would unduly prejudice Defendants.

The SEC argues that the November 2009 COM may be considered because it was issued during the period of fraud alleged in this case–March 2008 to December 2009. The SEC also asserts that it may refine its theories of fraud in discovery and that the cases Defendants cite in support of limiting the scope of the SEC's claims to the COMs are distinguishable because the complaints in those cases did not contain specific allegations of fraud.

When the SEC asserts a violation of § 10(b), Rule 10b-5, or § 17(a), the complaint must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.[23]  *See*, *e.g.*, *Fl. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 654–55 (explaining the applicability of 9(b) to securities fraud cases with the caveat that some circuits "apply a special standard" with regard to pleading scienter).  Rule 9(b)

---

[23]    The pleading standard for a private securities fraud case is further heightened by the Private Securities Litigation Reform Act (the "Reform Act"), 15 U.S.C. §§ 78u-4 and 78u-5.  However, the Reform Act requires that a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," does not apply to the SEC because it is a public entity.  *See id.* at § 78u-4(a)(1) ("The provisions of this subsection shall apply in each *private action* arising under this chapter.") (emphasis added).

states, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  Counts I-III of the SEC's First Amended Complaint are subject to Rule 9(b)'s heightened pleading requirements.  The purpose of Rule 9(b) is to provide defendants with sufficient notice of the allegations so that they may be able to formulate a response.  *Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 920 (8th Cir. 2001).  The Rule must be read in harmony with the principles of notice pleading.  *BJC Health Sys. v. Columbia Cas. Co.*, 478 F.3d 908, 917 (8th Cir. 2007).

Though the Court agrees with Defendants that the First Amended Complaint does not specifically mention the November 2009 COM, its inclusion in the Court's analysis does not alter its ultimate conclusions on the instant motions.  Further, this COM was issued during the time period of alleged fraud as outlined in the SEC's First Amended Complaint.  (FAC ¶¶ 2–19.)  Additionally, the November 2009 COM was produced in discovery as evidenced by the Bates numbers on the version attached to the first Carlson Affidavit.  For completeness, the Court will consider the November 2009 COM as it relates to the categories of purportedly material misleading statements that the SEC alleges constitute actionable conduct.

### C.    "Sham Affidavit" Doctrine

Defendants contend that the Bredesen Declaration should be disregarded under the sham affidavit doctrine because Bredesen's signing of the Subscription Agreement that accompanied the February 2009 COM contradicted statements contained in his

Declaration.  (Doc. No. 127, Bredesen Decl.)[24]  Defendants also argue that the SEC's

allegations of oral misrepresentations were asserted for the first time in its brief in

opposition to summary judgment and that none of these statements are attributable to

him.  (Doc. No. 146 (Duckson Reply Mem.) at 8–9; SEC Response Mem. to Duckson at

44.)  The Eighth Circuit Court of Appeals has addressed the issue of "sham affidavits,"

stating:

> Parties to a motion for summary judgment cannot create sham issues of fact
> in an effort to defeat summary judgment. . . .  While district courts must
> exercise extreme care not to take genuine issues of fact away from juries, a
> party should not be allowed to create issues of credibility by contradicting
> his own earlier testimony.  Ambiguities and even conflicts in a deponent's
> testimony are generally matters for the jury to sort out, but a district court
> may grant summary judgment where a party's sudden and unexplained
> revision of testimony creates an issue of fact where none existed before.
> Otherwise, any party could head off a summary judgment motion by
> supplanting previous depositions *ad hoc* with a new affidavit, and no case
> would ever be appropriate for summary judgment.

*Am. Airlines, Inc. v. KLM Royal Dutch Airlines, Inc*., 114 F.3d 108, 111 (8th Cir. 1997)

(citations omitted).  "[A] properly supported motion for summary judgment is not

defeated by self-serving affidavits."  *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006).

    Here, the thirteen investors, including Bredesen, who submitted declarations were

not deposed, or at least their deposition testimony appears not to have been submitted to

the Court.  Thus, there is no apparent issue of these investors' declarations contradicting

earlier sworn testimony.  Rather, Defendants rely on the statements in the Subscription

---

[24]    Though the parties' memoranda refer to a "Bredesen Affidavit," after a careful
review of the docket, the Court was able to find only the "Bredesen Declaration," which
is analyzed herein.  (Doc. No. 127.)

Agreement to serve as the basis for the purported contradictions.  This argument, which could be alleged against any of the investors that decided to invest in the Fund after the Hennessey foreclosure, is unavailing because, as discussed previously, the SEC does not need to prove actual reliance.  Further, Bredesen's understanding of the Fund's financial condition based on purported misstatements or omissions does not prevent the Court from considering his declaration under the sham affidavit doctrine because to do so would require the Court to prematurely find that the COMs contained no misstatements or omissions. The admissibility of statements made in the thirteen investor declarations, including the Bredesen Declaration, is an issue that will be resolved at trial.

### D.        Statements Not Attributable to Duckson

In their briefs and at oral argument, the SEC asserted that in the event the Court were to find that *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (2011) applies in this case, it was no longer asserting primary liability under § 10(b) or Rule 10b-5 against Duckson for the March 2008 COM, March 2008 COM, May 2008 Update Letter, and the October 2008 Update Letter.  (SEC Response Mem. to Duckson at 31, 33.)  The SEC maintains, however, that based on statements in these aforementioned documents, Duckson is subject to aiding abetting liability pursuant to § 10b-5 and primary liability under § 17(a).  As such, the Court does not include Duckson within the scope of its analysis as to primary liability under § 10b-5 based on statements contained in the March 2008 COM, March 2008 CIM, May 2008 Update Letter, or October 2008 Update Letter.

**III.     Liability for Allegedly Fraudulent Statements**

The SEC asserts three counts of securities fraud against the Fund, TFFM, and

Duckson:  primary violations of Section 10(b) of the Exchange Act 15 U.S.C. § 78j(b)

and Rule 10b-5 (17 C.F.R. § 240.10b-5); aiding and abetting liability for violations of

§ 10(b) of the Exchange Act 15 U.S.C. § 78j(b) and Rule 10b-5 (17 C.F.R. § 240.10b-5);

and violations of § 17(a)(1)–(3) of the Securities Act 15 U.S.C. § 77q(a)(1)–(3).

Defendants contend that the SEC has failed to demonstrate any genuine issues of material

fact supporting a finding that they violated any securities laws.  Specifically, Defendants

argue that the information the SEC claims was misleading was immaterial or accurate

and that the facts that the SEC claims were omitted were robustly and clearly disclosed.

Defendants further assert that in many instances the SEC improperly attempts to plead

fraud in hindsight in violation of Rule 9(b).

The Court will analyze each of the nine categories of statements first under a

§ 10(b) and Rule 10b-5 analysis based on each element required for primary and then

aiding and abetting liability.  To the extent relevant, these claims will then be analyzed

under the negligence standard of § 17(a).  Liability for individual defendants based on the

parties' interpretations of *Janus* and other relevant case law is addressed in later sections.

Section 10(b) of the Exchange Act forbids the "use or employ, in connection with

the purchase or sale of any security . . ., [of] any manipulative or deceptive device or

contrivance in contravention of such rules and regulations as the [SEC] may prescribe as

necessary or appropriate in the public interest or for the protection of investors."  *Tellabs,*

*Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007) (quoting 15 U.S.C.

§ 78j(b)).  Rule 10b-5, promulgated by the SEC under its section 10(b) authority, states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange,

> (a) To employ any device, scheme, or artifice to defraud,

> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  In order to bring a successful claim of securities fraud under

§ 10(b) or Rule 10b-5, the SEC must prove that Defendants made "a material

misstatement or omission in connection with the offer, sale, or purchase of a security by

means of interstate commerce" and that Defendants did so with scienter.  *Shanahan I*,

646 F.3d at 541 (internal citations omitted).

## A.    Materiality

A misrepresentation or omission is material if there is "a substantial likelihood that

the disclosure of the omitted fact would have been viewed by the reasonable investor as

having significantly altered the 'total mix of information made available.'"  *Parnes v.

Gateway 2000, Inc.*, 122 F.3d 539, 546 (8th Cir. 1997) (quoting *Basic, Inc. v. Levinson*,

485 U.S. 224, 231–32 (1988)).  In many cases, materiality is a factual question for a jury

to decide.  *Id.*  In those cases where the alleged misrepresentation could not have swayed

a reasonable investor, a court may determine, as a matter of law, that the alleged

misrepresentation is immaterial. *Id.* (citation omitted).

"Material information is that which "would have actual significance in the

deliberations of the reasonable shareholder." *K-Tel*, 300 F.3d at 897 (quoting *TSC Indus.,*

*Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)). Materiality is a "mixed question of

law and fact" that requires "delicate assessments of the inferences a 'reasonable

shareholder' would draw from a given set of facts and the significance of those inferences

to him." *TSC Indus.*, 426 U.S. at 450. Immaterial facts, in contrast, consist of

information or misrepresentations that would not "swa[y]" a "reasonable investor.

*Parnes*, 122 F.3d at 546. "Immaterial statements include vague, soft, puffing statements

or obvious hyperbole." *K-Tel*, 300 F.3d at 897 (internal citation omitted).

An entity is not required to disclose a fact merely because it is material; rather, a

duty to disclose arises "if there have been inaccurate, incomplete, or misleading

disclosures." *Sailors v. N. States Power Co.*, 4 F.3d 610, 612 (8th Cir. 1993); *see In re*

*Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997). Moreover, "[s]ilence,

absent a duty to disclose, is not misleading under Rule 10b-5." *Basic*, 485 U.S. at 239

n.17. Even in the absence of an affirmative duty to disclose, however, in connection with

a securities transaction, any party disclosing material facts has "a duty to speak fully and

truthfully on those subjects." *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268

(6th Cir. 1997). "However, the requirement is not to dump all known information with

every public announcement, but the law requires 'an actor to provide complete and

non-misleading information with respect to the subjects on which he undertakes to

44

speak.'"  *K-Tel*, 300 F.3d 898 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001)).

### B.    Misleading Statements or Omissions

In the context of a securities fraud claim, the truthfulness of a misstatement is evaluated at the time "when they were made."  *In re Navarre Corp.*, 299 F.3d 735, 742 (8th Cir. 2002); *see City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001) ("[A] plaintiff must set forth, as part of the circumstances constituting fraud, an explanation as to why the disputed statement was untrue or misleading when made.") (internal citation omitted).  The Eighth Circuit does not "countenance pleading fraud by hindsight" and has held that the "profitability" of a party's conduct "is not conclusive of intent."  *Green Tree*, 270 F.3d at 662.  "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."  *Navarre*, 299 F.3d at 743 (quoting *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)).

### C.    Scienter

"Scienter" is "the intent to deceive, manipulate, or defraud."  *Green Tree*, 270 F.3d at 653 (citations omitted).  Scienter may be established by facts demonstrating "a mental state embracing intent to deceive, manipulate, or defraud," by facts showing "severe recklessness," or with specific allegations of motive and opportunity.  *K-Tel*, 300 F.3d at 893–94.  Mere negligence or even gross negligence is not sufficient to establish scienter; however, a showing of recklessness may also satisfy the scienter requirement.  *Id*.  In *Green Tree*, the Eighth Circuit defined recklessness as:

45

> highly unreasonable omissions or misrepresentations that involve not
> merely simple or even inexcusable negligence, but an extreme departure
> from the standards of ordinary care, and that present a danger of misleading
> buyers or sellers which is either known to the defendant or is so obvious
> that the defendant must have been aware of it.

270 F.3d at 654; *see Shanahan I*, 646 F.3d at 536 (quoting *Green Tree* and explaining "we are among the circuits holding that a finding of scienter may be based upon 'severe recklessness'").  This definition of recklessness requires plaintiff to prove "something more egregious than even 'white heart/empty head' good faith."  *Shanahan I*, 646 F.3d at 543–44 (quoting *Sunstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977).  "It is insufficient to show that a defendant should have known that a material misstatement or omission was false or misleading."  *Shanahan I*, 646 F.3d at 544.  The issue of whether a particular intent existed is generally a question of fact for the jury. *K-Tel*, 300 F.3d at 894 (citing *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).

## 1.     Risks That Had Already Come to Pass

### a.     Material Misstatements or Omissions

The SEC argues that instead of merely summarizing the potential consequences of a default by the Funds' borrowers, the "Risks Factors" sections of the COMs should have affirmatively stated that its borrowers (including Heritage and Hennessey) actually defaulted on their payments to the Fund and were insolvent.  The SEC asserts that Defendants did not render this information immaterial by "obscu[ring] events that had already occurred as mere risks" (Doc. No. 124 (SEC Response Mem. to Funds) at 53

(citing *SEC v. Mozilo*, No. 09-3994, 2010 WL 3656068, at *9 (C.D. Cal. Sept. 16, 2010)

and *SEC v. Tecumseh Holdings Corp.*, 765 F. Supp. 2d 340, 352–56 (S.D.N.Y. 2011)).

The SEC contends that the statements of thirteen investors and five brokers

demonstrate that Defendants' misstatements and omissions regarding the Funds' risks

were material.  The SEC argues that though these individuals asserted that they read the

relevant risk disclosures in the COMs, CIMs, and other Fund marketing materials, they

were unaware that the Fund was on the verge of failure.  The SEC further argues that the

issue of whether a reasonable investor would have considered the misstated or omitted

information to be material is a highly fact-specific inquiry that is typically left to the jury.

In addition to Defendants' argument that the Subscription Agreements render any

statements beyond the COMs immaterial as a matter of law, which the Court has already

rejected, they argue that despite "full disclosure of the risks of investment," the Fund's

"sophisticated investors" were not dissuaded from investing and, therefore, the additional

disclosures the SEC alleges were omitted or misstated were immaterial.  (Funds' Mem. at

12.)  Defendants assert that the fact the Fund was a "high-risk, high-reward, illiquid,

alternative real-estate investment suitable only for sophisticated high-reward investors"

was "clearly and robustly" disclosed on the cover of each COM.  (Funds' Mem. at 9.)

The SEC alleges that an investor's supposed sophistication does not eliminate the

Defendants' obligation to make truthful and accurate disclosures.  The SEC emphasizes

that nurses, retired individuals, and teachers were included in what the Defendants

characterize as "sophisticated" and "accredited" investors and that aside from statements

contained in the Subscription Agreements, there is no evidence that these investors were
financially sophisticated.

The Court finds that the SEC has presented evidence that there are genuine issues
of material fact as to whether a reasonable investor would have considered information
regarding the affiliated borrowers' and Hennessey's defaults material to their decision to
invest or to continue to invest in the Fund. *TSC Indus*., 426 U.S. at 450. Such
determinations are highly fact-specific and the Court cannot conclude that information
about the increasing risks befalling the Fund due to the defaults was immaterial. *See
Gebhardt v. ConAgra Foods, Inc.*, 335 F.3d 824, 829 (8th Cir. 2003) ("Ordinarily,
materiality is a question of fact for the jury; however, we have recognized an exception in
cases where the false information is so insignificant, in relation to the total mix of data
available, that it would not have mattered to a reasonable investor.") (citing *Parnes*, 122
F.3d at 547). Defendants' arguments that additional disclosures would not have deterred
investors because they were sophisticated and chose to invest in the Fund despite the
risks inherent to mezzanine real estate lending are unavailing. A reasonable jury could
conclude that the use of the phrase "failed to meet certain economic covenants" rather
than the terms "default" or "insolvency" in describing the affiliated borrowers and
Hennessey was materially misleading. (November 2008 COM at CAP 0227840;
February 2009 COM, Notes to Financial Statements at 10.)

The Court also finds that critical issues of fact remain as to whether the Fund's
investors were "sophisticated," the circumstances under which these investors signed the
Subscription Agreements, and how any hearsay or parole evidence issues could affect the

materiality of the risk statements.  Even if the jury were to find that the Fund's investors

were sophisticated and knowingly accepted the warned of risks, this does not mean that

the Fund cannot be liable for misstating or omitting key information.  As the Supreme

Court explained in *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 526 (1974), the Securities

Exchange Act of 1934 "does not speak in terms of 'sophisticated' as opposed to

'unsophisticated' people dealing with securities. The rules when giants play are the same

as when the pygmies enter the market."  *Id.*; *cf. Quintel Corp. v. Citibank*, 596 F. Supp.

797, 801–02 (S.D.N.Y. 1984) ("Sophisticated investors are entitled to the protection of

section 10(b).").

Defendants assert that the COMs contained lengthy descriptions of the Fund's

risks, including the consequences of borrower default or an inability to sell the underlying

real estate.  They argue that despite having acknowledged these risks by signing the

Subscription Agreement, investors nonetheless decided to invest in the Fund.  Defendants

contend that these acknowledgements demonstrate that further disclosure would have

been immaterial as a matter of law.  Defendants cite an array of evidence demonstrating

that the Fund did explain the risks to its brokers and that many of these individuals

explicitly acknowledged understanding the risks and the Fund's financial situation.

Specifically, Defendants point to the testimony and written communications of three NFP

brokers after the late 2008 conference calls, the fact that NFP did not cease offering the

Fund to its clients immediately after the October 2008 conference call when the

Hennessey foreclosure was discussed, and NFP's March 2009 letter stating that it would

no longer directly sell the Fund to its clients but declining to outright forbid its brokers to

sell the Fund to their clients. Additionally, in support of their arguments regarding the

clarity and robustness of the Fund's disclosures, Defendants cite the testimony and

written communications of brokers Dyer, Calton, and Adamo about their decisions to

recommend the February 2009 Series I Notes to their clients and their belief that the

Fund's financial struggles were a result of the recession and would eventually rebound.

The SEC argues that though the COMs may have contained some information

regarding risks of default inherent to the collapse of the real estate market, such

disclosures were "buried in the midst of paragraphs of false or misleading statements."

(SEC's Response Mem. to Funds at 45.) It further argues that the COMs were

misleading because reading these documents as a whole, and given the importance of the

borrowers' defaults, these facts were not adequately disclosed. The SEC relies on several

cases from other jurisdictions in support of this argument including *In re Apple Computer

Sec. Litig.*, 886 F.2d 1109, 1116 (9th Cir. 1989), *SEC v. Mozilo*, No. 09-3994, 2010 WL

3656068, at *9 (C.D. Cal. Sept. 16, 2010) and *In re Flag Telecom Holdings Sec. Litig.*,

618 F. Supp. 2d 311, 324–25 (S.D.N.Y. 2009).

The conflicting statements of the Fund's investors and brokers demonstrate that

fact issues remain as to the materiality and accuracy of the purportedly misstated and

omitted risks. As discussed earlier, the SEC does not need to prove reliance to prevail on

its § 10(b) and Rule 10b-5 claims. *See Shanahan I*, 646 F.3d at 541; *see also SEC v.

Morgan Keegan & Co.*, 678 F.3d 1233, 1249 n.19 (11th Cir. 2012). Therefore, whether

or not some of the brokers or investors believed that the risk information was clearly and

accurately disclosed is not dispositive of the issue of whether in the "total mix" of

information available to a reasonable investor, additional facts regarding the default of the Fund's borrowers would have been material.  *Matrixx Initiatives*, 131 S. Ct. at 1318; *Basic*, 485 U.S. at 238.

The Court also finds that genuine issues of material fact remain as to whether a reasonable investor would have found the risk information misleading given that it was disbursed throughout the COMs.  Despite having read the COMs, some of the Fund's investors and brokers were unaware that the 2008 defaults occurred and that the Fund's borrowers were insolvent and unable to repay their loans.  "Full and fair disclosure cannot be achieved through piecemeal release of subsidiary facts which if stated together might provide a sufficient statement of the ultimate fact."  *Kennedy v. Tallant*, 710 F.2d 711, 720 (11th Cir. 1983) (internal citations omitted).  Though *Mozilo* is merely persuasive authority and does not align perfectly with the facts of this case, the court's focus on the positioning of critical securities disclosures is instructive.  As the *Mozilo* court explained, "a reasonable investor is not required to pore through" voluminous documents to glean critical information.  *Id.* at *11.  The COMs and CIMs were lengthy, dense documents, and information on the defaults, foreclosures, and insolvencies was peppered throughout several sections.

As the Supreme Court explained in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991), "not every mixture with the true will neutralize the deceptive.  If it would take a financial analyst to spot the tension between the one and the other, whatever is misleading will remain materially so, and liability should follow."

The fact that the allegedly misleading statements were accompanied by true statements does not render them immaterial as a matter of law.  *See id*.  Moreover, the fact that NFP, an indisputably sophisticated entity, hired an auditing firm to perform due diligence in order to ascertain or confirm this critical information could lead the fact finder to determine that the Fund's disclosures were inadequate and misleading.  *See id*.

Defendants cite several Eighth Circuit cases, including *In re Amdocs Ltd. Sec. Litig.*, 390 F.3d 542, 548 (8th Cir. 2004) in support of their argument that the information the SEC alleges was misrepresented or omitted was immaterial and neutralized by adequate warnings.  In *Amdocs*, the Eighth Circuit held:

> Alleged misrepresentations can be immaterial as a matter of law if they: 1) are of such common knowledge that a reasonable investor can be presumed to understand them; 2) present or conceal such insignificant data that, in the total mix of information, it simply would not matter; 3) are so vague and of such obvious hyperbole that no reasonable investor would rely upon them; or 4) are accompanied by sufficient cautionary statements.

*Id*. at 548 (citing *Parnes*, 122 F.3d at 546–48).  Furthermore, the Eighth Circuit held that sufficient "cautionary language" relating directly to the allegedly misleading statements "renders the alleged misrepresentation or omissions immaterial as a matter of law."  *Id*. (citing *Parnes*, 122 F.3d at 548.)  While the COMs and Subscription Agreements undoubtedly contained cautionary language regarding the consequences of default, they did not actually state that "defaults" had occurred, which was undoubtedly true beginning in March 2008.  Furthermore, nothing about the COMs made this information obvious or implicit such that the Court can find at this stage of the case that a reasonable investor would have understood that the borrower payments had ceased or were about to end.  The

SEC has presented ample evidence upon which a jury could determine that this information would have been important to a reasonable investor and that the risks disclosures were material and misleading.

### b. Scienter

Defendants claim that Duckson had no financial or professional motive to misstate the Fund's performance or risks, particularly given that he left Hinshaw to manage the Fund. Defendants also contend that he did not act with scienter in disclosing the Funds' risks. Specifically, Duckson asserts that throughout the COM drafting process, he reminded all of the participants that the contents needed to be true, accurate, and not misleading. Duckson also argues that after TFFM took control of the Fund's management in October 2008, he repeatedly reminded brokers and Fund advisors, both orally and in writing, that the Fund had foreclosed on Hennessey Financial and no longer had any operating cash flow. (Duckson Mem. at 21.) Additionally, Defendants rely on *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992) in support of their contention that repeated disclosure of purportedly improper activity does not support scienter.

The SEC contends that Duckson's assertion that he repeatedly reminded the drafters of the COMs and other Fund documents that the contents needed to be accurate is not supported by any evidence about what the other drafters may have known to be misleading or inaccurate. Moreover, the SEC asserts that because some of these communications predate March 2008, the beginning of the alleged period of fraud, some of this evidence is inadmissible and irrelevant because the SEC does not charge Duckson with any misconduct arising out of his legal advice to the Fund. The SEC argues that the

uncertainty as to what the other drafters knew creates a fact issue that remains unresolved and that summary judgment would be inappropriate.  Moreover, the SEC further argues that if Duckson truly believed that the Hennessey foreclosure and other affiliated borrower defaults were positive developments for the Fund, he would not have buried this information in the COMs or stated these facts in a way that was extremely reckless or intentionally misleading.

Defendants' arguments that he lacked scienter are largely dependent on the premise that the Fund's offering documents and marketing materials were true, complete, and not misleading.  The Court has already determined that genuine issues of material fact exist as to the truth, adequacy, and materiality of the Fund's risk disclosures. Scienter is typically an issue for the jury to determine.  A jury could find that after Duckson took over as the Fund's Investment Manager though TFFM in October 2008, he used language, such as "failed to meet certain economic covenants" in the disclosures to intentionally obscure the fact that the Fund's borrowers had defaulted.  (November 2008 COM at CAP 0227840; February 2009 COM, Notes to Financial Statements, at 10.) Duckson's testimony about this drafting decision adds to the lack of clarity as to his motive or level of intent in making this change.  *K-tel*, 300 F.3d at 893–94.  Furthermore, the intent of the individuals Duckson told to be careful about accuracy in drafting the Fund's documents is another unresolved fact issue for the jury.

As to Duckson's contention that he would not have left Hinshaw if he truly believed that the Fund was in peril, a jury could determine that the fact that over two-thirds of his billable client hours were on behalf of Gardner and his affiliates could

also explain Duckson's decision.  *Green Tree*, 270 F.3d at 653; *K-tel*, 300 F.3d at 893–

94.  Though the defendant in *SEC v. Steadman*, 967 F.2d 636, 642 (D.C. Cir. 1992) made

the same contention as the Defendants do in this case–repeated disclosure of allegedly

misleading or omitted information demonstrates an absence of scienter–*Steadman* is not

on all fours with the facts here.  Unlike the defendant in *Steadman*, Defendants stood to

benefit from obscuring the defaults and lack of cash flow into the Fund because after

November 2007 Defendants knew that they needed to bring in new investors to keep the

Fund viable.  *Id*.  Furthermore, Duckson's conduct in changing the phrasing regarding the

various defaults as evidenced in his November 2008 e-mail exchange with Williams

could be construed as bad faith, which was absent in *Steadman*.  *Id*.  Defendants' motion

is denied as to Rule 10b-5 liability for the incomplete and misleading risk statements

made during the entire period of alleged fraud–March 2008 to December 2009.

### 2.        Success of Fund's Strategy

### a.        Material Misstatements or Omissions

The SEC alleges that statements in the COMs' "Investment Objective Strategy"

sections regarding the increased potential for loan opportunities based on the credit crisis

and real estate market slowdown, decreased risk of default based on the quality of the

Fund's management, and beneficial changes to the Fund in 2008 including the Hennessey

foreclosure were misleading because they emphasized the positives without providing a

complete picture of the Fund's financial reality.  The SEC argues that summary judgment

should be denied because as in *Mozilo* and *Freudenberg v. E\*Trade Fin. Corp*, 712

F. Supp. 2d 171, 182–85 (S.D.N.Y. 2010) there was a "glaring disparity" between the Fund's optimistic statements and its purportedly dire financial situation.

Defendants contend that the Fund's strategy was fully disclosed in the COMs and that broker testimony confirms their awareness of these facts.  Defendants argue that because investors' money was locked-up for four years, their knowledge of the subsequent events was irrelevant and immaterial because they could not have pulled their investments from the Fund.  Defendants allege that the Fund's strategy had not failed because it was continuing to make its annual return through 2006.  They further allege that when viewed in the context of the Fund's overall investment strategy, the Hennessey foreclosure did not mean that the Fund had failed.  Moreover, Defendants argue that, at the time, the Hennessey and Heritage defaults were viewed as positive events that did not alter the Fund's underlying investment strategy, which was always dependent on the sale of the underlying properties.  Defendants also stress that the Fund's 2008 end of year financial statements demonstrated that the Fund's assets exceeded its liabilities and that neither of the Fund's auditors required the inclusion of any "subsequent events" or "going concern" statements in the March 2008 COM.

Much of the Court's analysis as to the materiality of the risks to the Fund applies to statements about the success of the Fund's strategy; the knowledge of brokers or investors does not determine whether issues of fact remain regarding the adequate disclosure of the Fund's strategy assessments.  *See TSC Indus.*, 426 U.S. at 450; *Gebhardt*, 335 F.3d at 829.  Thus, Defendant's argument that several brokers testified

that they were aware of the impact of the foreclosures and defaults on the Fund's overall strategy does not eliminate this fact issue.

Defendant's immateriality argument that information about the impact of the credit crisis, real estate market crash, and borrower defaults based on the fact that investors could not leave the Fund during the four-year lock-up period is well-taken. *See K-Tel*, 300 F.3d at 897; *Parnes*, 122 F.3d at 546; *Primary Care Investors*, 986 F.2d at 1214–25. Yet, seven new investors entered the Fund after November 2008, several months after the Heritage and Hennessey foreclosures. Moreover, the SEC's claims are brought on the public's behalf and are not limited to the investors that joined the Fund at a given time. *See* 15 U.S.C. § 78j(b), *Tellabs*, 127 S. Ct. at 2508 (2007). As the Eleventh Circuit explained in *Morgan Keegan*, "Congress designated the SEC as the primary enforcer of the securities laws, and a private plaintiff's 'reliance' does not bear on the determination of whether the securities laws were violated, only whether that plaintiff may recover damages." *Id*. at 678 F.3d at 1244 (internal citation omitted.) Thus, an issue of fact remains as to whether statements about the Fund's strategy constituted actionable fraud.

Defendants rely heavily on financial statements predating 2009 in support of their assertion that, based on the information available at the time, there were no concrete financial figures showing that the Fund's strategy had failed. At the end of 2008, the

Fund's assets appear to have exceeded its liabilities.[25]  Prior to 2009, the SEC has not

provided any evidence that demonstrates an issue of material fact that Defendant's

optimism about the Fund found in various e-mails and deposition testimony was not

justified when the statements were made.  Gardner's May 2008 letter regarding what

Gardner described as the "dismal news" of Hennessey's failure (Phillips Aff. ¶ 37, Ex. 37

at TD0009149) does not create an issue of fact in light of the optimistic statements about

the Hennessey foreclosure and the Fund's future in the "Investment Objective Strategy"

sections of the COMs, CIMs, May 2008 and October 2008 Update Letters, April 2008 e-

mail from Redpath, and October 2008 conference call with brokers.  In other words, in

May 2008, the fact that the Hennessey foreclosure was catastrophic for its investors does

not mean that it could not have been beneficial for its purchaser, the Fund.  Moreover, the

"modified" strategy described in the November 2008, February 2009, and November

2009 COMs demonstrate that the Fund was changing its financial positioning to respond

to the downturn in the real estate market.  (November 2008 COM at CAP 0227753;

February 2009 COM at 16; November 2009 COM at 0325587.)

In February 2009, however, when NFP notified the Fund of their final decision to

cease offering the Fund and over six months after the Hennessey foreclosure, a jury could

find that Defendants knew the Fund's lending strategy had failed.  Beginning with

statements made in February 2009, the Court agrees with the SEC that the disparity

between the investment strategy the Fund was pitching to its investors and its financial

---

[25]     The Court remains uncertain as to the extent to which the Fund's representations
regarding its assets were based on third-party appraisals.

realities became glaring, though not to an extent as great as in *Mozilo,* where the statements were shown to be manifestly untrue.  2010 WL 3656068, at *10.  Nor were the Fund's statements regarding its strategy and financial future as quantifiably incorrect as in *Freudenberg*.  712 F. Supp. 2d at 185 (denying defendants' motion to dismiss in part by reasoning that financial reports concretely showed that E*Trade's statements about the growth of "organic loans" were materially misleading because these loans comprised less than one-seventh of E*Trade's mortgage loans).  Here, Defendants have not presented the Court with evidence that any third-party appraisals of any of its real estate assets occurred after the February 2009 Marina appraisal.  Dyer's notes regarding these purported appraisals based on an April 2009 conversation with Duckson further muddy the factual waters on this issue.  The Court finds that sufficient fact issues remain upon which a reasonable investor could have found statements made from February 2009 to December 2009 about the Fund's strategy and projections misleading.  *See*, *e.g.*, (Carlson Aff. ¶ 6, Ex. 5 at 1).[26]

Defendants' assertions that the Fund's strategy was financially sound based on its auditors' 2008 assessments does not eliminate factual uncertainty as to its prospects and strategy in 2009.  The summer 2009 conference call where the Fund's Managing Director acknowledged that the Fund was "upside down" and the SEC filing Duckson signed

---

[26]    Even if the Court were to read Duckson's caveat that appraisals are "not an exact science" as a good faith cautionary warning, this does not change the Court's conclusion on this issue because whether these appraisals occurred and the extent to which they were reliable and independent remains an unresolved issue of material fact. (Carlson Aff. ¶ 6, Ex. 5 at 1.)

stating that the Fund had "faltered in a bear market" were indicative of the Fund's increasingly gloomy financial position.  (Phillips Aff. ¶ 49, Ex. 49 at 5; Phillips Aff. ¶ 57, Ex. 57 at 2.)  Thus, the Court finds that the SEC has presented evidence demonstrating issues of material fact as to Rule 10b-5 liability for the misleading nature of statements regarding the Fund's successful strategy made between February 2009 and December 2009.

With respect to the forward-looking, optimistic statements contained in the February 2009 Update Letters and Q&A Sheet, Defendants assert that these statements were immaterial as a matter of law because they were mere puffery.  Among other cases, the Defendants cite *In re Hutchinson Tech., Inc. Sec. Litig.*, 536 F.3d 952, 956, 960–61 (8th Cir. 2008) and *In re Metris Co. Sec. Litig.*, 428 F. Supp. 2d 1004, 1010–11 (D. Minn. 2006) in support of their contention that puffery is generally immaterial.  Defendants also argue that their positive forward-looking statements on earnings were immaterial as a result of various cautionary statements made in conference calls and SEC filings. Defendants assert that the Fund was a "non-traditional lender" and that the statements about lending opportunities arising out of the recession and credit crisis were too vague to constitute fraud.  (Funds' Mem. at 28 citing *In re Metris*, 428 F. Supp. 2d at 1011.) Defendants further assert that these forward-looking statements were accompanied by warnings about the deteriorating real estate market and that the Funds' optimism as to the market's turnaround was reasonable at that time.  Additionally, Defendants rely on *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1277 (D.C. Cir. 1994) to argue that federal securities laws do not require the disclosure of any and all material information and that

projections made based on a party's good faith reasonable belief as to their truth are not actionable.  Defendants also cite *Sailors v. Northern States Power* Co., 4 F.3d 610, 613 (8th Cir. 1993) in support of the proposition that "securities laws require disclosure of information that is not otherwise in the public domain" and that the Fund's 2009 SEC filings should be construed as additional warnings to investors.  (*Id.*)

The Court finds that Defendants' optimistic predictions regarding the Fund's strategy made before February 2009 were mere puffery.  Based on contemporaneous statements contained in the aforementioned e-mails and conference calls, Defendants' assertions that the Fund's financial situation was positive or at least stable were based on good faith belief, though wrong in hindsight.  *See Hutchinson*, 536 F.3d at 961; *Navarre*, 299 F.3d at 734.  No issues of material fact remain as to these strategy or projection statements made before 2009.

However, at the time the February 2009 COM and February 2009 Update Letters were issued, the facts appear to demonstrate that the Fund was desperate to raise additional capital from new investors.  Defendants are correct to point out that federal securities laws do not require disclosure of any and all information or information that is publicly available.  *See K-Tel*, 300 F.3d 898; *Sailors*, 4 F.3d at 613.  Yet, the Court cannot conclude, as the Eight Circuit did in *Hutchinson*, that the Fund's positive financial projections made from February 2009 to December 2009 were immaterial puffery.  536 F.3d at 960.  In *Hutchinson*, the Eighth Circuit reasoned that defendant's misleading statements about "events at one specific plant" did not satisfy "the PSLRA's heightened standard."  *Id.*  As discussed previously, the PSLRA does not apply to this public action.

*See* 15 U.S.C. § 78u-4(a)(1).  Furthermore, it appears that after the affiliated borrowers'

defaults in March 2008 and the Hennessey foreclosure in May 2008, nearly all of the

assets in the Fund's portfolio that had been generating interest cash flows had been

eliminated.  Thus, significant fact issues remain unresolved regarding the good faith

reasonable basis for the upbeat statements about the Fund's strategy and prospects for

success from February 2009 to December 2009.

Similarly, the extent to which cautionary statements about the impact of the real

estate market crash and tightening credit markets may have made positive statements

regarding the Fund's strategy immaterial remains an unresolved factual issue.  Unlike the

investor plaintiffs in *Hutchinson* and *Metris*, the Fund's investors could not compare their

perceptions against a stock price.  *Hutchinson*, 536 F.3d at 955−57 (recounting relevant

quarterly financial results contrasted to changes in Hutchinson's stock price); *Metris*, 428

F. Supp. 2d at 1007−09 (summarizing allegedly fraudulent statements and their relation

to Metris's stock price fluctuations).  Therefore, the Fund's statements about the value of

its assets and prospects for future success were important in the "total mix" of

information a reasonable investor would have considered.  *Matrixx Initiatives*, 131 S. Ct.

at 1318; *Basic*, 485 U.S. at 238.

The Court agrees with Defendants' assertion that the statements about the Fund's

strategy and future success were somewhat vague, as were the statements in *Metris*. 428

F. Supp. 2d at 1008 (listing allegedly misleading statements including "business is on a

much stronger profitability track than it has ever been" and "we have built a

fundamentally sound business that is clearly poised for continued profitability").  As the

court explained in *Metris*, "[b]road statements concerning a company's financial well-being are not specific enough to be material." *Id*. at 1011.  Here, however, rather than explicitly informing investors that because of the real estate market downturn, the Fund's assets had dramatically declined in value and were increasingly difficult to sell, the Fund used these events to create a sense of urgency for increased investment.  *See* February 2009 CIM at AS 005071, February 2009 Q&A Sheet at 1, February 2009 Update Letter at NFP 162189.  While the Court finds the vagueness of the Fund's strategy statements to be a close call, it nonetheless finds that genuine issues of material fact remain as to whether this information was material and misleading, particularly given the stark contrast between the Fund's financial reality from February 2009 to December 2009 and the one it painted for its investors.

### b.      Scienter

The SEC argues that in 2009 Duckson knew that without the infusion of additional capital, the Fund would fail and that he acknowledged that the Fund had "faltered," yet continued to make positive financial forecasts.  (SEC Response to Duckson Mem. at 39.) The SEC emphasizes that genuine issues of material fact exist regarding what Duckson and others may have believed about the true state of the Fund's strategy and financial future.  The SEC asserts that even if Defendants did believe that the Fund's outlook was rosy, this did not excuse them from fully and accurately disclosing the consequences of the Hennessey foreclosure and the Fund's cash flow difficulties.  The SEC points to the April 2008 e-mail between Redpath and Bozora, which Duckson was copied on, as

evidence Defendants' efforts to "concoct" a positive story to tell investors. (SEC Response Mem. to Duckson at 43.)

Defendants contend that in 2009, the Fund's assets exceeded its liabilities and that as of June 2009, it had sufficient funds to repay its investors. They argue that the SEC's allegation that Defendants acted with scienter in attempting to hide the Fund's financial status is illogical because the COMs and the Fund's SEC filings expressly disclosed that the Fund was negatively impacted by the global recession. Defendants also emphasize that the April 2008 e-mail between Bozora and Redpath regarding the "great story" of the Fund's financial state was, as the e-mail stated, "real," and that the SEC's selective inclusion of the e-mail's content does not support scienter. (Phillips Aff. ¶ 29, Ex. 29 at TD 0036578–79.)

The SEC's attempt to create a fact issue by cherry-picking language from the April 2008 e-mail is misleading and inappropriate. The second half of the sentence, "and it's real" supports Defendants' contention that they believed that the Fund's strategy remained successful at that point in time. (Phillips Aff. ¶ 29, Ex. 29 at TD 0036578–79.) Yet, the Court finds unresolved issues of fact as to the materiality, truth, and reasonable good faith basis for the Fund's positive statements about its strategy from February 2009 to December 2009. The fact that Duckson disclosed that the Fund "faltered" in an October 2009 SEC filing does not definitively demonstrate an absence of scienter based on extreme recklessness or motive, particularly given that this statement was made after the February 2009 Series I Notes offering and the accompanying marketing materials had

64

been distributed nearly eight months earlier. *Green Tree*, 270 F.3d at 653; *K-tel*, 300 F.3d at 893–94.

The parties dispute the applicability of *SEC v. Aqua Vie Beverage Corp.*, No. CV 04-414-S-EJL, 2007 WL 1430765, at *11, 14 (D. Idaho May 14, 2007) to the facts in this case. Though *Aqua Vie* is merely persuasive authority, the Court finds it illustrative of some of the critical fact issues that remain in the instant case regarding statements as to the success of the Fund's investment strategy. The SEC alleges that this case stands for the proposition that summary judgment should be denied when fact issues, such as the extent of Duckson's knowledge of the Fund's depleted cash flows, remain unresolved. Defendants, on the other hand, contend that this case is distinguishable because the court in *Aqua Vie* was not asked to decide whether the facts alleged could defeat scienter as a matter of law, and, in that case, the defendant knew that the revenue projections would have been impossible to achieve given product supply problems. (*Id.* at *13–14.) Defendants maintain that at the time Duckson issued positive statements about the Fund's financial future, he believed that the Fund's assets exceeded its liabilities. As the Court discussed previously, however, significant fact issues remain unresolved as to whether the Fund's asset valuation was based on reliable third-party appraisals sufficient to demonstrate a good faith basis for Defendants' optimistic beliefs.

### 3.     Foreclosure Terminology

#### a.     Material Misstatements

The SEC asserts that the March 2008 COM's use of the term "Voluntarily Surrendered Collateral" to describe the associated borrowers' (Heritage, Argus, and

Omni) default to Hennessey was an attempt to paint these defaults and foreclosures as

inconsequential.  (March 2008 COM at CAP 0175109.)  The SEC further asserts that this

terminology was misleading and omitted the critical information that the Fund's income

stream was compromised by the affiliated borrowers' defaults.  Similarly, the SEC argues

that though the "Business" sections of the November 2008 and February 2009 COMs

contained several sentences referencing the Hennessey "foreclosure," they did not

mention its default.  (November 2008 COM at CAP 0227764; February 2009 COM at

26.)  The SEC also argues that the use of the term "voluntary foreclosure process" in the

February 2009 Update Letters to describe the Hennessey default and foreclosure was

misleading because it mischaracterized Hennessey's insolvency and did not include the

critical relevant fact that the Fund was no longer receiving interest payments from

Hennessey.  (February 2009 Update Letter at NFP 162189.)  According to the SEC,

broker testimony, including that of Fish, demonstrates that the foreclosure information

was material to investors and was not adequately disclosed.

Defendants argue that the phrase "voluntarily surrendered collateral" was not

misleading because that was precisely what the transaction was called and that there was

no "foreclosure" between Heritage and Hennessey.  (Funds' Reply Mem. at 8.)

Furthermore, Defendants assert the fact that the Fund's borrowers had defaulted was

implicit to the phrase "voluntarily surrendered collateral" because logically, a default

precedes foreclosure.  Defendants cite to several state statutes including Minn. Stat.

§ 325G.22 in support of their argument that their use of the term "Voluntarily

Surrendered Collateral" was not misleading.  They also argue that broker testimony and

the March 2009 letter from NFP to its brokers demonstrate that this information was clearly and accurately disclosed.

Indisputably, the stream of cash flows from Hennessey, the Fund's largest borrower, was of critical importance to investors' returns. This was particularly true after Hennessey foreclosed on its affiliated borrowers in March 2008. Thus, the statements about the Heritage and Hennessey foreclosures may be material because a reasonable investor would have considered this information to be important to assessing whether he or she would receive a monthly disbursement from the Fund.

A closer issue, however, is whether Defendants' use of the purportedly accurate phrase "voluntarily surrendered collateral" was misleading. Black's Law Dictionary defines "foreclosure" as "[a] legal proceeding to terminate a mortgagor's interest in property, instituted by the lender (the mortgagee) either to gain title or to force a sale in order to satisfy the unpaid debt secured by the property." Black's Law Dictionary 719 (9th ed. 2009). Black's Law Dictionary lists over a half-dozen types of foreclosure, none of which are termed "voluntary foreclosure." *Id*. However, a "nonjudicial foreclosure" or "power-of-sale foreclosure" is defined as "[a] foreclosure process by which, according to the mortgage instrument and a state statute, the mortgaged property is sold at a nonjudicial public sale by a public official, the mortgagee, or a trustee, without the stringent notice requirements, procedural burdens, or delays of a judicial foreclosure." *Id*. Minn. Stat. § 325G.22 does not contain the precise term "voluntarily surrendered collateral," but does include the term "voluntarily" in Subdivision 1 entitled "Personal liability of buyer limited":

67

> If the seller or lender repossesses or *voluntarily accepts surrender of*
> *personal property* in which the seller or lender has a security interest
> arising out of a consumer credit transaction and the aggregate amount of the
> credit extended in the transaction was $3,000 or less, the buyer is not
> personally liable to the seller or lender for the unpaid balance of the debt
> arising from the consumer credit transaction, and the seller or lender is not
> obligated to resell the collateral.

(*Id.* (emphasis added).)  Aside from the fact that Minn. Stat. § 325G.22 appears to be

relevant to personal rather than real property, it does not contain the term "default."

Similarly, the Shorter Oxford English Dictionary defines "foreclosure" as "[t]he action of

foreclosing a mortgage or depriving a mortgagor of the right of redemption; a proceeding

to bar the right of redeeming mortgaged property" without using the word "default."

New Shorter OED 1000 (Lesley Brown ed. 1993).

Contrary to Defendant's assertions, the Court finds that a genuine issue of material

fact remains as to whether the term "voluntarily surrendered collateral" to describe a

default followed by a foreclosure, even a voluntary one, was misleading.  Though the

agreement between the Fund and Hennessey was called a "Voluntary Surrender

Agreement," the fact that none of the aforementioned definitions explain that default

precedes foreclosure makes the implicitness of this relationship less than clear.  (Carlson

Aff. ¶ 7, Ex. 6 at 1.)  Defendants may be correct in asserting that there was no

"foreclosure" in the strict legal sense of the term or as it is commonly used.  Yet, material

issues of fact remain as to how misleading this term was in conveying the foreclosure's

effect on the Fund's cash flows.  The description of the transaction between Hennessey

and the Fund in the November 2008 COM, February 2009 COM, and February 2009

Update Letters using the phrase "voluntary foreclosure process" or "foreclosure on

68

[Hennessey]" may have been easier for a reasonable investor to equate with default and the extinguishment of cash flows. However, the Court cannot conclude that no fact issues remain as to whether these terms were misleading when considered as part of the total mix of information that a reasonable investor would have taken into account in making an investment decision. *Matrixx Initiatives*, 131 S. Ct. at 1318; *Basic*, 485 U.S. at 238.

### b.      Scienter

The SEC argues that the November 2008 e-mail exchange between Duckson and Williams regarding the language used to describe Hennessey's default is evidence of scienter because the phrase "failed to meet certain economic covenants" obscured the reality of Hennessey's failure to make payments to the Fund. (November 2008 COM at CAP 0227840; February 2009 COM, Notes to Financial Statements, at 10.) The SEC asserts that though the Hennessey default and foreclosure may have been a windfall for Duckson because he received any profit above the fixed returns, it eliminated a large portion of the interest income upon which investors had relied for their monthly payments. The SEC further argues that if the defaults and foreclosures were truly viewed as positive developments, then this information would not have been relegated to later pages of the COMs.

Defendants assert there is no evidence of scienter because nothing about their description of any of the defaults or foreclosures was inaccurate or misleading. Defendants assert that based on third-party appraisals, the Hennessey foreclosure was viewed as a positive development for the Fund because it acquired valuable equity

interests in Hennessey's underlying properties.  They further assert that foreclosure is not necessarily a negative event and that the SEC's claim with respect to the defaults and foreclosures constitute an impermissible attempt to plead fraud in hindsight.

The Court has previously determined that genuine issues of fact exist upon which a jury could reasonably find that the use of the phrase "failed to meet certain economic covenants" instead of "default" was intended to obscure the fact that the Fund's borrowers had defaulted.  (November 2008 COM at CAP 0227840; February 2009 COM, Notes to Financial Statements at 10.)  The decision to use the term "Voluntarily Surrendered Collateral" instead of "foreclosure" could similarly be construed as an attempt to deceive investors at a time when the Fund was increasingly dependent on new capital to stay afloat.  *K-tel*, 300 F.3d at 893–94.  Though the Hennessey transaction brought the potential for a significant financial payout for Duckson because any equity in excess of the interest payments went to him, it had an unfavorable effect on investors by eliminating a large portion of the investment cash flows upon which investors relied for their monthly returns.  (Duckson Dep. I at 41.)  This profit structure provided Defendants with a motive to hide the defaults and foreclosures from investors and creates unresolved fact issues as to scienter regarding the foreclosure terminology.  *Green Tree*, 270 F.3d at 653; *K-tel*, 300 F.3d at 893–95.  Moreover, as with the disbursed placement of information about the Fund's risks and strategy, genuine issues of material fact remain as to whether the decision to include the foreclosure information in later portions of the COMs was egregiously reckless or done in an attempt to deceive investors.  *Green Tree*,

270 F.3d at 653; *K-tel*, 300 F.3d at 893–94; *see also Virginia Bankshares*, 501 U.S. at

1097 (1991).

### 4.      Credit Bid for Hennessey Assets

The SEC claims that the November 2008 and February 2009 COMs' description

of the Fund's $55 million acquisition of Hennessey improperly omitted critical material

information including the fact that the Fund was the only bidder, that the Fund did not

pay expend funds because it made a credit bid, and that the transaction extinguished

Hennessey's debt to the Fund.  Defendants contend that credit bids at auctions are

commonplace and that the SEC has failed to show that the COMs' statements about the

transaction were misleading or indicative of scienter.

The Court has already determined that the Fund's acquisition of Hennessey was

material, yet the fact issue with regard to these credit bid statements is whether it was

material that the Fund made a credit bid rather than a cash bid.  As with the foreclosures,

fact issues remain as to the materiality of the bid type because of its impact on the Fund's

cash flows, namely, eliminating the payment streams from Hennessey.  The other issue is

whether Defendants had a duty to disclose the bid type.  The Court finds that no issues of

material fact remain as to whether Defendants had a duty to disclose the bid type.  *See*

*K-Tel*, 300 F.3d 898 (declining to require disclosure of any and all information on a given

topic); *see also Basic*, 485 U.S. at 239 n.17; *Sailors*, 4 F.3d at 613.  Though a reasonable

investor could have found this distinction between bid types important in the total mix of

information, the Court cannot find that Defendants had a duty to disclose the bid type.

71

Thus, the Court need not evaluate whether fact issues exist as to scienter and Defendants' motions as to Rule 10b-5 liability for these credit bid-related statements are granted.

### 5.      Loans to CS SPVs

The SEC asserts that statements in the COMs about the Fund's plans to make loans to CS Midwest and CS Southeast to bring in interest income were misleading and false because no funds were actually transferred back from these SPVs to the Fund until September 2009.  The SEC further asserts that the Fund merely transferred money to these SPVs to pay real estate taxes on the properties it acquired from Hennessey and to pay senior lenders.  The SEC alleges that there was no evidence that any loans were ever made to these entities.  Defendants argue that the SEC made these allegations for the first time in its summary judgment brief and that such claims are outside the scope of the First Amended Complaint.  Defendants contend that FIN 46[27] prohibited the Fund from showing any interest payments it received from CS Midwest and CS Southeast in its financial statements.

---

[27]      Fin. Accounting Standards Bd., Fin. Accounting Foundation, FASB Interpretation No. 46, at 17 (2003) provides in relevant part:

> **Initial Measurement**
> 20. The primary beneficiary of a variable interest entity shall initially measure assets and liabilities that it has transferred to that variable interest entity at, after, or shortly before the date that the enterprise became the primary beneficiary at the same amounts at which the assets and liabilities would have been measured if they had not been transferred.  No gain or loss shall be recognized because of such transfers.

*Id.*

The Court finds that genuine issues of fact remain as to whether information on the Fund's plans to lend to the CS entities was material.  The interest payments on these loans could have had a direct effect on the Fund's monthly disbursements to investors.  However, the Court does not find anything misleading or untrue about the statements regarding the lending arrangement between the Fund and the CS entities in the November 2008 COM and November 2008 CIM.  Moreover, Defendants' explanation as to why cash flows from the CS entities to the Fund may not have been readily ascertainable based on FIN 46 defeats the SEC's arguments in support of an inference scienter.  Defendants' motions are granted as to these statements.

### 6.      Use of Funds to Pay Expenses and Existing Investors

### a.      Material Misstatements

The SEC asserts that the statements in the COMs that the interest payments investors received would come solely from the notes the Fund issued and on credit enhancements were misleading and false after Hennessey's default.  At that point, the Fund was using new investors' money to pay interest to existing investors and to pay expenses of the real estate assets the Fund now carried through its SPVs.  The SEC further asserts, based on *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), that even literally true statements can nonetheless be misleading and form the basis for a securities fraud action.  The SEC also refutes the Defendants' contention that it was obvious that the proceeds of the November 2008 and February 2009 issuances could be used exclusively to service senior debt and expenses on the underlying real estate.

Defendants contend that they repeatedly and adequately disclosed the risk that investors could lose their investment and that the Fund's payment of priority distributions to investors did not change after the Hennessey foreclosure.  They also reiterate that the note payments were always dependent upon the sale of the underlying real estate assets and that the fact that the Fund's cash flows could be used to pay existing investors was included in the nine categories of uses for funds disclosed in the "Custodian Agreements" sections of the November 2008, February 2009, and November 2009 COMs.  (November 2008 COM at 0227765–66; February 2009 COM at 27–28; November 2009 COM at CAP 0325599.)

As was the case with statements regarding the Fund's risks, strategy, and foreclosure on Hennessey, fact issues remain as to whether a reasonable investor would consider statements about the relevance of his or her investment money going towards the payment of expenses, senior creditors, and paying the returns of other Fund investors to be material.  In other words, the Court finds that a reasonable juror could conclude that it would have been important to investors to know that their money was not going towards interest-earning investments but rather toward staving off the Fund's insolvency. The disclosure of the possibility that the Fund's financial resources could be dedicated to these purposes in the "Custodian Agreements" of the November 2008, February 2009, and November 2009 COMs does not mean that these statements were not misleading or incomplete.  *SEC v. Gabelli*, 653 F.3d at 57 ("The law is well settled, however, that so-called "half-truths"–literally true statements that create a materially misleading impression–will support claims for securities fraud.") (internal citations omitted).  The

Court finds that significant fact issues remain as to whether this disclosure was misleading or omitted the critical information that after the Hennessey foreclosure nearly all of the Fund's resources were being expended to keep it from failure. (Gardner Dep. at 340–44; Saylor Aff. ¶¶ 21–22.)

### b.    Scienter

The SEC asserts that Duckson's knowledge that the Fund would fail without the infusion of additional capital as motive evidence of scienter. Defendants assert that the COMs "expressly disclosed" that investors' capital could be used to cover the Fund's operating cash flows and financial obligations, precluding a finding of scienter.

Much of the Court's scienter analysis as to the Fund's risks, strategy, and use of foreclosure terminology applies to the statements regarding the use of investor funds in that fact issues remain as to Defendants' motive in not providing full, accurate disclosure of the defaults: the need to bring in new investors to keep it afloat. This approach to saving the Fund was specifically discussed as early as November 2007 as an option and issues of fact remain as to the extent that the need for new investor funds affected the Fund's disclosure of its cash flow woes. *See*, *e.g.*, Phillips Aff. ¶ 87, Ex. 87 at 2, CAP 0101597; Phillips Aff. ¶ 49, Ex. 49 at 5. Though some investors in 2009 acknowledged that they may have been throwing good money after bad, the Court cannot determine that after May 2008 no fact issues exist as to the highly-fact specific inquiry into the Fund's motive or recklessness in making these statements. *Green Tree*, 270 F.3d at 653; *K-tel*, 300 F.3d at 893–94. Defendants' motions for summary judgment on the SEC's claims for Rule 10b-5 primary liability are granted for this category for statements

made between March 2008 and April 2008 and denied as to statements made between May 2008 and December 2009.

### 7.   FCB Lawsuit

Though the November 2008 and February 2009 COMs and the February 2009 Update Letters described the counterclaims that the Fund asserted in the June 2008 FCB lawsuit, the SEC contends that these materials failed to mention that FCB disputed the ownership priorities of the underlying real estate.[28]  Defendants contend that information on FCB's claims was not included in the COMs and update letters because Duckson considered the suit to be frivolous.

The statements regarding the FCB lawsuit could be seen by a reasonable investor as material because the issue at the heart of the suit was the priority of the parties' equity interests in the underlying real estate collateral.  Similarly, based on the facts before the Court, fact issues remain as to whether the COMs and February 2009 Update Letters improperly omitted information as to the nature of FCB's claims against the Fund. However, the Court does not find any genuine issues of fact that would support a finding that Duckson or the Fund defendants acted with scienter.  Duckson's belief that the

---

[28]     In support of its argument that Duckson was not truthful about his knowledge about the extent of Hennessey's financial troubles, the SEC recounts Duckson's deposition testimony disclaiming knowledge of the Hennessey default and foreclosure in the FCB lawsuit.  (SEC Response Mem. to Duckson at 24, 41.)  The Court does not find this testimony to be dispositive of his knowledge of the FCB lawsuit itself and, therefore, it does not affect the Court's conclusion as to the fact issues that remain with respect to the FCB lawsuit.

lawsuit was "frivolous" appears to have been based on a reasonable good faith belief.[29]
(Duckson Dep. II at 227.)  Defendants' motions are granted as to these statements
regarding the FCB lawsuit.

### 8.    Interest Reserve Account Amount

The SEC alleges that the statements in the November 2008 COM and CIM that the
Fund's interest and redemption reserve had a current balance of "approximately
$8,000,000" consisting of "cash and other assets with short term liquidity" were material
and misleading because the Fund did not actually have $8 million solely in cash reserves.
(November 2008 COM at CAP 0227763; November 2008 CIM at 10.)  Specifically, the
SEC cites Fish's testimony in support of the materiality of the level of the interest
reserves because of its bearing on the Fund's ability to continue to make monthly
payments to its investors.  Defendants contend that as of November 2008, the Fund had
$8 million in the interest reserve account consisting of cash and other liquid assets.  They
assert that this statement was true when the November COM and CIM were issued and
that the SEC has not asserted any facts demonstrating scienter.

Genuine issues of material fact remain as to whether this information was material
because the interest reserve provided a source for monthly investor payments in the event
that the Fund's cash flows were inadequate, which appears to have been the case
beginning in late 2008.  However, the SEC's attempt to assert that the $8 million figure

---

[29]    The fact that the case eventually settled has no bearing on whether fact issues
remain unresolved regarding the FCB lawsuit statements because neither party has
provided specific facts of the settlement, nor were they necessarily required to do so.

was inaccurate because it was comprised of short-term liquid assets in addition to cash is unavailing.  The November COM and CIM indisputably state that the account consisted of  "cash and *other assets with short term liquidity*."  (November 2008 COM at CAP 0227763; November 2008 CIM at 10) (emphasis added).  The SEC has not pointed to any reliable or material evidence demonstrating that the statements in the November 2008 COM and CIM as to the level of the Fund's interest reserve account was not accurate at the time they were was made.  Duckson's decision to close the interest reserve in late November 2008 and broker Fish's recollection regarding the December 2008 level of the interest reserve account do not create sufficient issues of material fact for the SEC's claims regarding this statement sufficient to survive summary judgment.

### 9. Statements Regarding Gardner's Background

The SEC asserts that the sections of the March 2008 COM and CIM and the February 2009 CIM that summarized Gardner's thirty years of experience as a real estate developer and financier were fraudulent because they did not state that by 2008 his entities–Hennessey, Heritage, Argus, and Omni–had all failed.  (March 2008 COM at CAP 0175123; March 2008 CIM at AS 004906; February 2009 CIM at AS 005078.)  The SEC further alleges that in a prior investigation, Duckson testified that Gardner may have been using the Fund's payments to Hennessey to pay other entities rather than make mezzanine real estate loans.  Defendants contend that the SEC has not pointed to any facts that show scienter regarding these statements and that the information on Gardner was merely biographical and that these documents "dispassionately" described Gardner's background.  (Funds' Reply Mem. at 11.)

These statements regarding Gardner's background appear to be purely biographical.  The Court cannot find a basis upon which to determine that Defendants had a duty to detail his failures given that typically, biographical summaries include only favorable accomplishments and experience.  *See Basic*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5.").  Furthermore, federal securities laws do not require the disclosure of any and all information on a particular topic.  *See K-Tel*, 300 F.3d 898; *Sailors*, 4 F.3d at 613.  The Court finds no genuine issues of fact as to the materiality, truth, or scienter with which these statements were made.  Defendants' motions as to these statements regarding Gardner's background are granted.

## IV.    Applicability of *Janus* to Individual Liability

In *Janus*, First Derivative, a class of stockholders in Janus Capital Group ("JCG"), claimed that Janus Capital Management ("JCM"), the investment adviser for Janus Investment Fund ("JIF"), made false statements in prospectuses JIF filed with the SEC.  *Janus Capital Grp. v. First Derivative Traders*, 131 S. Ct. 2296, 2299–2300 (2011).  The Supreme Court pointed out that JIF and JCG were separate legal entities, that JIF's sole assets were owned by its investors, even though JCG created JIF, and that the two entities maintained "more independence than is required" given that only one member of the JIF board was associated with JCM.  *Id.* at 2299.  The Supreme Court held that only those individuals or entities who have "ultimate authority" to make a statement, "including its content and whether and how to communicate it," can be held liable for "making" the statement under § 10(b) and Rule 10b-5.  *Id.* at 2302.

The Supreme Court reasoned that although JCM contributed to and was consulted about misleading statements in JIF's prospectus, JCM was not the "maker" of the statements. It noted that the trust, rather than its adviser, had the obligation to file the prospectuses with the SEC, even though JCM was "significantly involved" in preparing the prospectuses. *Id.* at 2304–05. Because JCM did not have ultimate authority over the prospectuses, any assistance it provided constituted mere suggestion. *Id.*; *see also In re Fannie Mae 2008 Sec. Litig.*, No. 10 Civ. 9184, 2012 WL 3758537, at *6 (S.D.N.Y. Aug. 30, 2012) ("In the post-*Janus* world, an executive may be held accountable where the executive had ultimate authority over the company's statement; signed the company's statement; ratified and approved the company's statement; or where the statement is attributed to the executive."). The Supreme Court appeared to limit its holding to private actions under Rule 10b-5 and did not address what effect, if any, its holding had on which entities can be liable for "making" statements in SEC enforcement actions. 131 S. Ct. at 2301.

Duckson argues, based on *Janus*, that the Fund "made" the representations in the COMs because though he participated in the drafting process, he did not sign any of the COMs. Duckson further argues that, as a matter of law, he did not have ultimate authority over the November 2008 and February 2009 COMs because TFFM, not Duckson, was the Fund's Investment Manager. He cites three cases from other jurisdictions including, *Kerr v. Exobox Techs. Corp.*, No. H-10-4221, 2012 WL 201872, at *11–12 (S.D. Tex. Jan. 23, 2012), in support of his argument that an individual's control over corporate filing documents does not necessarily rise to Rule 10b-5 liability.

Duckson contends that *Janus*'s "ultimate authority" test prevents the Court from finding him primarily or secondarily liable under Rule10b-5.  He further contends that either the Fund or TFFM was the "maker" of the statements at issue.  *Id*.  Duckson also points to numerous incorporation documents demonstrating that the Fund and TFFM were wholly separate entities, and argues that only TFFM had ultimate authority because TFFM, not Duckson, was the Fund's Investment Manager.  (Duckson Reply Mem. at 2–3.)

The SEC argues that *Janus* does not apply to this case because it is not a private securities fraud action and because *Janus* does not apply to § 17(a) claims.  The SEC emphasizes that Duckson and TFFM had ultimate authority over the three COMs and the marketing materials that were issued after Duckson's investment firm, TFFM, became the Fund's Investment Manager in October 2008.  The SEC also points out that Duckson signed the February 2009 Update Letters and that several of the CIMS stated that Duckson oversaw the Fund's operations and strategy.

The law remains unsettled as to whether *Janus* applies to a public securities fraud action.  The Court was unable to find any mandatory authority in the Eighth Circuit or this District on this issue.  Courts in other districts have been split on *Janus*'s applicability to SEC enforcement actions.  *Compare SEC v. Pentagon Capital Mgmt.*, 844 F. Supp. 2d 377, 421–22 (S.D.N.Y. 2012) (finding *Janus* inapplicable to SEC enforcement actions under §§ 10(b) and 17(a)) *with SEC v. Carter*, No. 10-C-6145, 2011 WL 5980966, at *2–3 (N.D. Ill. Nov. 28, 2011) (applying *Janus* to a public securities fraud action).

Regardless of *Janus*'s applicability, based on the analysis above, the Court has found genuine issues of material fact in four of the nine aforementioned categories of statements (risks, strategy, foreclosure terminology, and use of investor funds).  The Court has found unresolved fact issues regarding misrepresentations about the Fund's risks and use of alternative foreclosure terminology made between the entire period of fraud:  March 2008 to December 2009.  Though the Court found that fact issues remain as to statements about the success of the Fund's investment strategy and its use of investor funds, it has limited the temporal scope of the SEC's claims in these two categories:  strategy statements (February 2009 to December 2009) and use of investor funds (May 2008 to December 2009).

Given the varying time spans of statements at issue and the fact that these statements appear in multiple documents, the Court will begin by analyzing primary liability for each Defendant based on the scope of documents over which Duckson, TFFM, or the Fund may have had control.  The SEC concedes that statements in the March 2008 COM and CIM and May 2008 and October 2008 Update Letters, and the February 2009 Q&A Sheet do not give rise to primary Rule 10b-5 liability for Duckson or TFFM.  As such, the Court does not find Duckson or TFFM primarily liable for statements made in these documents.

With respect to the remaining documents at issue–the November 2008, February 2009, November 2009 COMs, the November 2008 and February 2009 CIMs, and the February 2009 Update Letters–genuine issues of material fact remain unresolved as to whether Duckson, or, in the alternative, TFFM, had ultimate authority.  Redpath's

Declaration and Duckson's deposition testimony seem to indicate that Duckson had

authority over the COMs and CIMs issued after October 2008.  (Redpath Decl. ¶¶ 6, 8;

*see* Duckson Dep. II at 51−54.)  Yet, Defendants insist that the partnership agreements

and corporate documents demonstrate that the Fund, TFFM, and Duckson were

independent and that, in his individual capacity, Duckson could not have ultimate

authority over the allegedly fraudulent statements.  (Duckson Reply Mem. at 2–3.)

The extensive interconnectedness between Duckson, Gardner, Redpath, Bozora,

and their various entities distinguish this case from *Janus* and prevents the Court from

finding as a matter of law that TFFM was distinct from Duckson sufficient to prevent

Duckson from incurring primarily liability.  Moreover, the Court declines to decide

whether it may be appropriate to disregard TFFM's status as a separate entity in light of

the fact that, indisputably, Duckson had controlling ownership and decision-making

authority over TFFM.  Based on the above facts, and because TFFM was the Fund's

Investment Manager, it appears that Duckson, or alternatively, TFFM, may have had

ultimate authority over the November 2008, February 2009, November 2009 COMs, the

November 2008 and February 2009 CIMs, and the February 2009 Update Letters.

(Redpath Decl. ¶¶ 5, 8; Duckson Dep. II at 55−56.)

**V.      Aiding and Abetting Liability as to TFFM and Duckson**

In the alternative, the SEC alleges that Duckson and TFFM are liable for aiding

and abetting the Fund's violations of Rule 10b-5.  (SEC Response Mem. to Funds at 29.)

Based on representations in the SEC's memoranda and at oral argument, the SEC no

longer claims that Duckson and TFFM are primarily liable for the March 2008 COM,

March 2008 CIM, May 2008 Update Letter, October 2008 Update Letter, and the

February 2009 Q&A Sheet.  (SEC Response Mem. to Duckson at 31, 33.)  Instead, the

SEC asserts that Duckson and TFFM are secondarily liable for statements contained in

these documents under an aiding and abetting theory under Rule 10b-5.

TFFM asserts that it cannot be secondarily liable because no primary violations

occurred and because the SEC cannot prove that TFFM was aware of the primary actor's

(Duckson) role in the fraudulent scheme.  TFFM further asserts that it is entitled to

summary judgment on the SEC's aiding and abetting claim because Duckson, "who

owned and controlled TFFM," was unaware of the purported fraudulent scheme and that

assertions of TFFM's negligence are insufficient for aiding and abetting liability.

Defendants rely on *Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353,

366 (5th Cir. 2004) and *In re Apple Computer, Inc. Sec. Litig.*, 243 F. Supp. 2d 1012,

1023 (N.D. Cal. 2002) to argue that the SEC can satisfy the knowledge element of its

aiding and abetting claim only if it can show that a natural person, Duckson, possessed

such knowledge and acted with scienter.  Duckson asserts that without allegations that

another natural person acted with scienter, logically, he cannot be liable for aiding and

abetting himself.  Duckson also challenges the SEC's assertion that Redpath and

Bozoras' alleged scienter could give rise to Defendants' secondary liability.

The Eighth Circuit has a three-pronged approach to determining liability for aiding

and abetting the commission of securities violations.  *Camp v. Dema*, 948 F.2d 455, 459

(8th Cir. 1991); *SEC v. Thielbar*, No. 06-4253, 2008 WL 4360964, at *9 (D.S.D.

Sept. 24, 2008).  First, the court asks whether a primary party has committed a securities

law violation.  *Camp*, 948 F.2d at 459.  Second, the court assesses the aider and abettor's

"knowledge" of the violation.  *Id*.  Third, the court evaluates whether the aider and

abettor substantially assisted the primary violator in committing the violation.  *Id.*

Knowledge and substantial assistance are inversely related, "where there is a minimal

showing of substantial assistance, a greater showing of scienter is required." *Id*.  The

"exact level" of knowledge is fact-dependent, but negligence is insufficient.  *In re K-Tel*

*Intern., Inc. Sec. Litig.*, 300 F.3d 881, 893 (8th Cir. 2002).  An aider and abettor can also

be found secondarily liable if that party was aware of the primary violator's "illegal

scheme."  *K&S P'ship v. Cont'l Bank, N.A.*, 952 F.2d 971, 977 (8th Cir. 1991).

Additionally, issuer-entities may be liable for fraudulent statements made by analysts.

*See In re Navarre Corp. Sec. Litig*, 299 F.3d 735, 743 (8th Cir. 2002).

 The Court need analyze the secondary liability of Duckson and TFFM only for the

statements for which it found potential primary liability, namely, the risks (March 2008–

December 2009), strategy (February 2009–December 2009), foreclosure terminology

(March 2008–December 2009), and use of investor funds (May 2008–December 2009).

*See Camp*, 948 F.2d at 459.  Furthermore, based on the analysis in the preceding section,

Duckson, or, in the alternative, TFFM, could be potentially primarily liable for statements

regarding the four aforementioned categories contained in the November 2008, February

2009, November 2009 COMs, the November 2008 and February 2009 CIMs, and the

February 2009 Update Letters because they appear to have had ultimate authority over

the contents of these documents.  As such, the Court need not analyze statements contained in these documents for secondary liability.

Next, the Court will analyze secondary liability for statements contained in documents for which the SEC does not assert primary liability against Duckson or TFFM. The March 2008 COM contained statements for which the Court has found potential primary liability for statements regarding the Fund's risk disclosures and use of foreclosure terminology.  The February 2009 Q&A Sheet also contained allegedly fraudulent statements about the Fund's successful strategy.  The Court finds that genuine issues of material fact remain as to whether Duckson gave substantial assistance to the Fund in drafting the March 2008 COM through his position as the Fund's counsel. Similarly, Duckson's authority over the contents of the February 2009 Q&A Sheet remains an unresolved fact question given Duckson's undisputed involvement in drafting Fund documents in February 2009.  Though TFFM is technically an entity separate from Duckson himself, outstanding fact issues suggest that Duckson and TFFM could be viewed as one and the same for liability purposes given the inseparableness of their role as the Fund's Investment Manager.

Neither *Southland* nor *In Re Apple Computer* is mandatory authority in this Circuit.  Nor are they directly applicable here.  Though the Fifth Circuit in *Southland* analyzed scienter by evaluating "the state of mind of the individual corporate official or officials who make or issue the statement," it did not preclude liability of such an individual who directly furnished, ordered, or approved material misstatements. *Southland*, 365 F.3d at 366.  Because the facts remain unclear as to whether Duckson

suggested or approved allegedly fraudulent statements in the March 2008 COM and CIM, May 2008 and October 2008 Update Letters, and February 2009 Q&A Sheet, *Southland* does not preclude a reasonable fact finder from assigning secondary liability to Duckson and TFFM. Duckson's arguments based on *In re Apple Computer* are similarly unpersuasive because it was a private securities fraud action involving issues of collective scienter and the heightened pleading requirements of the PSLRA, neither of which is central to this case. 243 F. Supp. 2d at 1023 (analyzing claims under PLSRA and explaining that the Ninth Circuit rejected the collective scienter concept in assessing corporate liability). Therefore, Duckson and TFFM's motions for summary judgment on the SEC's secondary liability claims based on the four remaining categories of statements are denied.

### A.    Section § 17(a) Liability

Duckson argues that there is no evidence that he acted negligently by assuming that the Fund's "sophisticated investors" would understand key terminology, using language from previous transactions in Fund documents, and concluding that the Fund's disclosures were based on its auditors' reviews. He further argues, based on *Fletcher v. Zellmer*, 909 F. Supp. 678, 682 (D. Minn. 1995), that reasonable mistakes do not constitute negligence. Duckson urges this Court to apply *Janus* to the § 17(a) claims alleged and points to several district courts in other jurisdictions that have done so. *See, e.g.*, *SEC v. Perry*, No. CIV-11-1309, 2012 WL 1959566, at *8 (C.D. Cal. May 31, 2012); *SEC v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). He further asserts that because there is no evidence of scheme liability, he cannot be liable under § 17(a).

87

The Fund Defendants assert that the SEC improperly recasts its Rule 10b-5 claims as scheme liability claims under § 17(a).  They maintain that the SEC has not shown evidence of scheme liability between Defendants, and that the SEC's § 17(a) claims are not alleged with sufficient particularity.

The SEC claims it has cited evidence that shows that Duckson and TFFM had ultimate authority over the November 2008, February 2009, and November 2009 COMs, the November 2008 and February 2009 CIMs, and the February 2009 Update Letters. The SEC argues that, if they acted with the requisite intent, Defendants can be liable under § 17(a) even if they did not "make" the fraudulent statements.  The SEC asserts that because § 17(a) does not contain the term "make" and because a majority of courts examining this issue have held *Janus* inapplicable to public actions, this Court should reach the same conclusion in this case.

Courts use nearly identical tests for § 10(b) and § 17(a) violations.  *See SEC v. Brown*, 579 F. Supp. 2d 1228, 1242–43 (D. Minn. 2008) (applying a single analysis to claims under §§ 10(b) and 17(a)).  Sections 17(a)(2) and (3) of the 1933 Act provide that it is unlawful in the offer or sale of securities "to obtain money or property" by means of an untrue material statement of fact or omission, or to engage in any practice or course of business "which operates or would operate as a fraud or deceit upon the purchaser." 15 U.S.C. § 77q(a).  The Eighth Circuit has held that violations of § 17(a)(1) require proof that the defendant acted with scienter, while violations of § 17(a)(2) and (3) require only proof of negligence.  *Shanahan I*, 646 F.3d at 545.  To prove a violation of § 17(a)(2) or (3), the SEC must show that Defendants "acted negligently" in their

purported omissions or misstatements, meaning that they failed to use the degree of care and skill that a reasonable person of ordinary prudence and intelligence would be expected to exercise in the situation.  *Id.* at 545–46; *see Pagel, Inc. v. SEC*, 803 F.2d 942, 946 (8th Cir. 1986); *SEC v. Hughes Capital Corp.*, 124 F.3d 449, 453–454 (3d Cir. 1997).

With respect to the SEC's claims against Defendants based on § 17(a)(2) and (3), the Court need only analyze the claims where genuine issues of fact remain as to whether the statements were material and misleading.  The Court will only evaluate the claims that may have been materially misleading but not necessarily made with scienter.  Thus, the three remaining statements to evaluate under §17(a)(2) and (3) are those regarding the Fund's investment strategy from March 2008 to January 2009, the use of new investor funds to pay existing investors and expenses from March 2008 to April 2008, and the FCB lawsuit.

Because the SEC's claims based on § 17(a)(1) require scienter, the same factual issues remain unresolved with respect to the aforementioned four categories of statements the Court has already analyzed under Rule10b-5.  *See Aaron v. SEC*, 446 U.S. 680, 697 (1980); *Shanahan I*, 646 F.3d at 541.  Additionally, Defendants' reliance on *Public Pension Fund Grp. v. KV Pharm. Co.*, 679 F.3d 972 (8th Cir. 2012) in support of their arguments against scheme liability is misplaced because that private securities fraud case makes no mention of § 17(a) liability.  Thus, for the same reasons discussed above, Defendants' motions are denied as to § 17(a)(1) liability for the four aforementioned statement categories with the same temporal limitations.

89

Defendants' motions are also denied as to § 17(a)(2) and (3) liability for statements regarding the Fund's purportedly successful strategy and its use of investor funds after the defaults.  Given the real estate market collapse and increased risks and uncertainty resulting from the global recession, the Court finds that genuine issues of fact remain as to whether Defendants were negligent in not informing investors that these events negatively impacted the Fund's cash flows.  A reasonable finder of fact could determine that Defendants had a duty to disclose this information and that Defendants did not exercise ordinary reasonable care in not explicitly stating in clear, non-misleading terms that nearly all the Fund's associated borrowers were insolvent.  Moreover, given Defendants' assertions as to their experience and expertise in real estate finance, their assessments of the Fund's risks could be found to be unreasonable mistakes.  Thus, the facts here are distinguishable from *Fletcher*.  909 F. Supp. at 682.

Similarly, the Court finds unresolved fact issues as to whether Defendants breached their duty of reasonable care by failing to disclose that between March 2008 and April 2008, the affiliated borrowers' defaults that preceded the Hennessey foreclosure led to an increasing percentage of investor funds going toward expenses rather than interest-earning investments.  The facts demonstrate that the Argus, Omni, and Heritage defaults had already occurred by the end of March 2008 and cut off critical cash flows to the Fund, which flowed through Hennessey.

However, the Court cannot find that Defendants had a duty to disclose additional information on the FCB lawsuit in the November 2008 and February 2009 COMs and the February 2009 Update Letters.  While the nature of FCB's claims and their potential

impact on the Fund's security interest in the underlying real estate arguably should have been disclosed, the Court finds that no fact issues remain that would support § 17(a)(2) and (3) liability for these statements.

The March 2008 and November 2008 COMs appear to be the primary documents containing statements relevant to the two remaining statement categories for § 17(a)(2) and (3) liability. As with the Court's analysis regarding Defendants' Rule 10b-5 liability, the Court need not reach the issue of whether *Janus* applies to claims for which no issues of material fact remain on the SEC's § 17(a) claims. The same document-specific analysis that applies to the SEC's Rule 10b-5 claims also applies to the SEC's §17(a) claims against Defendants. Therefore, the Court finds that under § 17(a)(2) and (3), the Fund could be liable for statements contained in the March 2008 COM and that Duckson and TFFM could be liable for statements contained in the November 2008 COM.

## VI.   Availability of Remedies Against Duckson[30]

Duckson argues that even if he is found liable for some of the aforementioned statements, none of the remedies the SEC seeks against him are available as a matter of law. The parties agree that the Court rather than the jury will determine the availability of remedies against Duckson. While courts in this District have granted summary judgment based on the unavailability of remedies as a matter of law, no such finding is required when genuine issues of material fact remain unresolved. *Compare SEC v. Shanahan*, No. 07-2879, 2010 WL 173819, at *9 (D. Minn. Jan. 13, 2010) (*Shanahan II*),

---

[30]   The Fund Defendants did not assert any remedies-related arguments, nor did they appear to join in Duckson's arguments.

with *SEC v. Everest Mgmt. Corp.*, 466 F. Supp. 167, 172 (S.D.N.Y. 1979) (explaining

that injunctive relief on summary judgment is typically not granted "where issues of fact

remain concerning the existence and nature of past violations or the reasonable likelihood

of future violations").  The Court finds that myriad issues of material fact remain and that

it cannot grant Duckson's motion for summary judgment on the basis of the

unavailability of remedies.

### A.      Injunctive Relief

Duckson argues that injunctive relief is not appropriate because it is not

reasonably likely that he will commit future violations, he lacked scienter, and, even if

the Court were to find scienter, his conduct was not egregious.  He emphasizes that

securities regulators have never before charged him with misconduct and that none of the

Fund's clients have sued him in conjunction with his work on behalf of TFFM or the

Fund.  Duckson contends that the allegedly fraudulent conduct occurred over the course

of one year and that the SEC's delay in bringing this action shows that it does not

consider him a danger to other investors.  He further contends that the SEC has pointed to

only one fact, a purported misrepresentation to True North, demonstrating misconduct

after December 2009.  Duckson asserts that he is truly remorseful and that he does not

intend to work in the securities field in the future.

The SEC argues that Duckson's egregious conduct demonstrates a high degree of

scienter.  Given Duckson's extensive experience in transactional finance, the SEC asserts

that Duckson is likely to return to securities work.  The SEC also emphasizes the gravity

of the unlawful conduct that occurred over the course of several years.

The court may enjoin an individual who is committing or is about to commit acts or practices that violate the Exchange Act of 1934 or any SEC Rules prohibiting such conduct.  15 U.S.C. § 78u(d)(3).  The SEC has the burden of showing that a violation occurred and that there is "a reasonable likelihood of further violation in the future." *SEC v. Comserv Corp.*, 908 F.2d 1407, 1412 (8th Cir. 1990) (internal citation omitted). In *SEC v. Shanahan*, No. 07-2879, 2010 WL 173819, at *9 (D. Minn. Jan. 13, 2010) (*Shanahan II*), the court evaluated several factors in determining the likelihood of future violations:  the existence of past violations, the degree and egregiousness of scienter, whether the conduct was isolated or recurring, whether the defendant recognized and took responsibility for his or her conduct, the sincerity of the defendant's remorse, and whether the defendant was likely to have future opportunities to offend based on his or her professional background.  *Id*. at *9 (internal citations omitted).

Duckson's remedies-based arguments rely heavily on drawing parallels between the instant case and *Shanahan II*, where the court granted summary judgment in favor of defendants on the basis that the remedies the SEC sought were not available as a matter of law.  Though the standards employed in *Shanahan II* are applicable here, the facts in *Shanahan II* contrast starkly with this case.  *Shanahan II* involved allegations of accounting fraud in overstating profits; the court emphasized that the "misstatements at issue did not cause serious harm to . . . shareholders."  2010 WL 173819, at *2–3, *14. Furthermore, the *Shanahan II* defendants "received no personal profit" from their misstatements and were Irish citizens who had never applied for or been offered a position with a publicly traded company in the United States.  *Id*. at *1, *8, *14.

93

Here, in contrast, the allegedly fraudulent statements were contained in offering documents and marketing materials used to attract new investors, whose combined losses could be measured in millions of dollars.  Duckson earned several million dollars in fees from his work on behalf of the Fund.  Also, Duckson is a U.S. citizen with extensive relevant experience that could make him attractive to publicly traded companies.  His prospects for future employment with a publicly traded company in the United States are substantially greater than those of the *Shanahan II* defendants.

The Court concludes that issues of material fact exist as to whether an injunction would be appropriate against Duckson.  The Court has already determined that fact issues about Duckson's scienter are unresolved; it would be premature to decide how egregious his conduct or scienter was at this point.  Duckson was a partner at a large national law firm and has many years of experience in securities; he may very well have opportunities to work with or for publicly traded companies in the future and to commit additional violations.  Though this case is the first time Duckson has been charged with violating securities laws, the sincerity of his remorse and desire to avoid future offenses are not clear based on the facts currently before the Court.  At this stage of the case, the Court cannot determine as a matter of law that an injunction against Duckson would be inappropriate.

### B.       Officer-Director Bar

Duckson argues that an officer-director bar is unavailable as a matter of law because he did not financially benefit from the alleged misstatements or omissions.  He emphasizes, based on broker testimony, that the COMs were easy to understand and that there is no basis upon which to find an underlying violation.  Pursuant to 15 U.S.C. § 78u(d)(2), the SEC seeks an order barring Duckson from seeking such positions and asserts that Duckson's conduct demonstrates that he is unfit to serve as the director or officer of a public company.

In determining the availability and appropriateness of an officer-director bar, the Court considers a number of factors including:  "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur."  *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995) (internal citations omitted); *see Shanahan II*, 2010 WL 173819, at *9.  Many of these factors overlap with the injunction analysis above.  Significant fact issues remain as to the degree of Duckson's scienter and likelihood that he would reoffend.  Though Duckson would likely not be considered a repeat offender, he had a central role in the alleged fraud as the Fund's Investment Manager.  Duckson had a substantial financial interest in the success of the Fund because any profits beyond those dedicated to the monthly investor payments went to Duckson.  On these facts, an officer-director bar may be an available remedy.

### C.    Disgorgement

Duckson asserts that the SEC cannot obtain disgorgement as a matter of law because there is no causal link between his allegedly unlawful conduct and any ill-gotten gains.  He further asserts that the fees he earned based on work not related to the allegedly fraudulent materials are not separable from the lawful work he performed on behalf of the Fund.  Duckson also claims that disgorgement is not possible because the Fund's assets were not liquid.  Moreover, he purports that Transactional Finance, the intermediate entity Duckson created, did not profit from any misconduct and that any profits Transactional Finance earned were not connected to the conduct at issue in this case.  Duckson contrasts this case to *SEC v. Brown*, 579 F. Supp. 2d 1228, 1245 (D. Minn. 2008), to illustrate that his gains were minimal and he was paid only half of the approximately $6 million in fees to which he was entitled.

The SEC asserts a "but for" causation argument in support of disgorgement, namely, that if the Fund had been liquidated in March 2008, Duckson would not have received investment fees and the Fund could not have continued to receive new investor funds under fraudulent pretenses.  Specifically, the SEC asserts that Duckson's fees, the $3.67 million Transactional Finance received from the Fund from October 2008 to June 2009, the $466,000 of American Express bills paid on Duckson's behalf in early 2009 and early 2011, and the approximately $275,000 in direct payments to Duckson from True North in 2010 constitute ill-gotten gains.  The SEC also counters that *Brown* does not preclude disgorgement based on fraud even if the fees earned were in part for lawful services.

Disgorgement is a remedy based on the court's equitable powers aimed at discouraging future violations and making investors whole. *See SEC v. Brown*, 579 F. Supp. 2d at 1245; *SEC v. O'Hagan*, 901 F. Supp. 1461, 1468 (D. Minn. 1995).  In order to show that disgorgement is appropriate, the SEC must demonstrate a close connection between defendant's financial gains and the illegal conduct. *See SEC v. Willis*, 472 F. Supp. 1250, 1275–76 (D.D.C. 1978).  However, the SEC must distinguish between profits derived through legal means and those that were obtained illegally. *See SEC v. First City Fin. Corp., Ltd.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) (internal citations omitted); *CFTC v. British Am. Commodity*, 788 F.2d 92, 93–94 (2d Cir. 1986).

While the Court is not convinced that immediate liquidation of the Fund would have been financially prudent and that the SEC's but for causation argument may be overreaching, the Court cannot determine as a matter of law that the fees Duckson earned for his legal conduct cannot be separated from the fees he earned engaging in illegal conduct. *Cf. SEC v. Perry*, No. 11-1309, 2012 WL 1959566, at *6 (C.D. Cal. May 31, 2012).  Moreover, the percentage of Duckson's fee is not determinative of whether it was ill-gotten. *Compare SEC v. Radical Bunny, LLC*, No. 09-1560, 2011 WL 1458698, at *8 (D. Ariz. Apr. 12, 2011) (finding disgorgement of 2% fee charged to investors was appropriate), *with Brown*, 579 F. Supp. 2d at 1238 (ordering disgorgement of $869,633, which was twenty times greater than defendant's agreed-upon compensation).  A jury could reasonably find that the fees Duckson earned between March 2008 and December 2009 for his work on behalf of the Fund were directly connected to his efforts to keep the

Fund going even though its borrowers had defaulted and it was speeding toward insolvency.

### D.   Civil Penalties

Duckson contends that he has already suffered substantial financial and reputational damage as a result of this case.  He further contends that he too lost money when the Fund failed and asserts that a civil penalty is not appropriate.  The SEC argues that the fact that Duckson brought a defamation claim against Clouser in 2011 shows that as of that date, Duckson's reputation was still worth defending.  The SEC also makes moral and policy-based arguments for the need to punish Duckson for his wrongdoing to deter future offenders and to compensate investors for their losses.

The Court considers several factors in determining the appropriateness of civil penalties including:  "(1) the level of defendant's culpability, (2) the public harm caused by the violations, (3) defendant's profits from the violations, and (4) defendant's ability to pay a penalty." *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 399 (2d Cir. 2004) (internal citations omitted).  The Court has already determined that the level of Duckson's culpability remains an unresolved fact question, as does the extent to which Duckson profited from his actions.  The record is also unclear as to whether Duckson has sufficient funds to pay a civil penalty.  The Fund's investors were substantially harmed by the Fund's downfall and the loss of their investments, which, was likely caused in large part by the real estate market crash and credit crisis.  *Cf. SEC v. Sunwest Mgmt., Inc.*, No. 6:09-cv-6056, at *5–6 (D. Ore. Oct. 5, 2012).  Though the Fund may not have failed solely because of Duckson's conduct, his actions allowed for additional investors

to unwittingly put their money toward an investment that, as time progressed in 2008 and 2009, was known to be spiraling toward failure.  As such, the Court cannot determine that a civil penalty may not be an appropriate remedy.

## CONCLUSION

Regardless of the cause of the Fund's downfall, Defendants had an obligation to inform investors of the Fund's financial status in a way that was clear and not misleading. Based on the facts in the record, genuine issues of material fact remain upon which a jury could reasonably conclude that Duckson and the Fund Defendants intentionally hid this information from investors.  The parties are encouraged to further narrow their arguments and factual disputes prior to trial.  Based upon a review of the record and all of the arguments and submissions of the parties and the Court being otherwise duly advised in the premises, the Court hereby enters the following:

## ORDER

Defendants Capital Solutions Monthly Income Fund, LP and Transactional Finance Fund Management, LLCs' Joint Motion for Summary Judgment (Doc. No. [113]) and Defendant Todd A. Duckson's Motion for Summary Judgment (Doc. No. [117]) are **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      Absent reference to a specific time period, the Court's order applies to statements made during the entire alleged period of fraud (March 2008 to December 2009);

2.      Defendants' motions are **DENIED** to the extent that they seek dismissal of primary liability claims under Rule 10b-5 or § 17(a)(1) for statements regarding the

Fund's risks, strategy success (February 2009 to December 2009), foreclosure terminology, and use investor funds (May 2008 to December 2009);

3.      Defendants' motions are **GRANTED** to the extent they seek dismissal of primary liability claims under Rule 10b-5 or § 17(a)(1) for statements regarding the Hennessey credit bid, loans to CS entities, use of investor funds (March 2008 to April 2008), FCB lawsuit, interest reserve account level, and Gardner's background;

4.      Defendants' motions are **DENIED** to the extent they seek dismissal of secondary liability claims under Rule 10b-5 for statements regarding the Fund's risks, strategy success (February 2009 to December 2009), foreclosure terminology, and use investor funds (May 2008 to December 2009);

5.      Defendants' motions are **GRANTED** to the extent they seek dismissal of secondary liability claims under Rule 10b-5 for statements regarding the Hennessey credit bid, loans to CS entities, use of investor funds (March 2008 to April 2008), FCB lawsuit, interest reserve account level, and Gardner's background;

6.      Defendants' motions are **DENIED** to the extent they seek dismissal of § 17(a)(2) and (3) claims for statements regarding the success of the Fund's strategy (March 2008 to January 2009) and use of investor funds (March 2008 to April 2008); and

7.      Defendants' motions are **GRANTED** to the extent they seek dismissal of § 17(a)(2) and (3) claims for statements regarding the FCB lawsuit.


Dated:  November 9, 2012          s/Donovan W. Frank
                                  DONOVAN W. FRANK
                                  United States District Judge